Helen Russell PIERCE, Executrix of the Last Will and Testament of George Washington Pierce, Deceased, Plaintiff,

v.

INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Defendant,

Mackay Radio and Telegraph Company, Inc.,

On Application to Intervene as Defendant

Civ. A. No. 296–54.

United States District Court
D. New Jersey.

Jan. 9, 1957.

Harry B. Rook, Newark, N. J. by David Rines, Robert H. Rines, Boston, Mass., for plaintiff.

McCarter, English & Studer, by Francis E. P. McCarter, Newark, N. J., J. Pierre Kolisch, John M. Calimafde, New

York City, Ralph B. Stewart, Washington, D. C., for defendant.

HARTSHORNE, District Judge.

In this patent infringement suit plaintiff is the executrix of the estate of George Washington Pierce, a Harvard University physicist professor, who claims to have invented the first practical commercial system for the control of the electric oscillations, basic to the use of radio transmission. This is alleged substantially to result from the incorporation in his electrical circuit of a piezo-electric crystal, which he claims definitely controls such oscillations under his system alone, and without which crystals such system would not oscillate at all. The six patents in this regard, Nos. 2,133,642, 2,133,643, 2,133,645, 2,-133,646, 2,133,648 and 2,266,070, were applied for by Dr. Pierce in 1924, but were not granted till 1938 or thereabouts, due to many questions raised by the Patent Office, and litigation dealing with the priority of invention, as well as what defendant International Telephone & Telegraph, ("I T & T"), admits in one of its stipulated letters to be the "complexity" of the subject matter. Due to the important bearing of the subject matter on long distance communication, the use of the system, after the issuance of the patents, was greatly affected by the U. S. Government's need therefor during World War II. Thereafter, though not till June 1951, much litigation ensued as to alleged infringements of the patent, this litigation primarily having been instituted in the First Federal Circuit, where Dr. Pierce lived. The first such patent infringement suit was filed in the United States District Court for the District of Massachusetts June 1, 1951 against the American Communications Company, a customer of I T & T. In early 1954 Pierce next sued Hewlett-Packard Co., Pierce v. Hewlett-Packard Co., D.C., 125 F.Supp. 329, raising much the same issues, and shortly thereafter he similarly sued the Mackay Radio & Telegraph Co., ("Mackay"), the latter being a wholly-owned subsidiary of American Cable & Radio Corporation, which in turn is largely, but not wholly, owned by I T & T. However, to none of these suits was I T & T a party, though its wholly-owned subsidiary Federal Telephone & Radio Corporation declined this opportunity in the American Communications suit.

Before starting the Mackay and Hewlett-Packard suits, Pierce had obtained a decision in his favor in the Massachusetts District Court, D.C.Mass. 1953, 111 F.Supp. 181, as to the validity of the so-called basic patent—No. 2,133,-642, on his motion for partial summary judgment, this motion having apparently left open for later hearing the issues involving the other patents. This decision was, however, reversed by the Court of Appeals for the First Circuit, on the ground of double patenting, 1 Cir., 1953, 208 F.2d 763, certiorari denied 347 U.S. 944, 970, 74 S.Ct. 639, 775, 98 L.Ed. 1092, 1111, rehearing denied 348 U.S. 851, 75 S.Ct. 18, 99 L.Ed. 671. Thereupon Pierce started the above Mackay and Hewlett-Packard suits, raising apparently the same issues, and presumably on the theory that there was no privity between such defendants and American Communications, so that the decision in favor of the latter defendant was not res judicata as to the others. Both the Mackay suit, and the balance of the issues in the American Communications suit, are still pending in the Federal Courts in the First Circuit, the Hewlett-Packard case, not involving I T & T in any way, having been disposed of, D.C.Mass.1954, 125 F. Supp. 329, affirmed, 1 Cir., 1955, 220 F.2d 531, certiorari denied 350 U.S. 833, 76 S. Ct. 69. Since I T & T was not a party to any of the three above suits in the First Circuit, Pierce on April 19, 1954 then sued I T & T in the present suit. Of course, since the issues in these four suits were substantially the same, if the parties had been the same or in privity, this Court should have proceeded no further with the suit here, under well settled principles of comity. Kerotest Manufacturing Co. v. C–O Two Fire Equipment Co., 3 Cir., 1951, 189 F.2d 31, 35, af-

firmed 1952, 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200; Crosley Corp. v. Hazeltine Corp., 3 Cir., 1941, 122 F.2d 925, certiorari denied, 1942, 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211; Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., D.C.N.J.1956, 140 F.Supp. 588, 590, Id., 141 F.Supp. 645. Indeed, in November 1954, I T & T moved this Court to stay its hand pending further proceedings in the above litigation in the First Circuit, the decision thereon being deferred, by agreement of counsel, pending further proceedings in the First Circuit.

■ Both in the American Communications suit and in the instant suit the respective defendants raised the defense of laches. But this laches issue in the American Communications suit differed from such issue in the instant suit, because laches is a personal defense, and the basic facts in that regard, provable here by I T & T, were to a large extent different from those provable by American Communications. Thus counsel on both sides asked this Court, despite the pendency and priority of the above suits in the First Circuit, to proceed to hear separately this differing issue of laches as it bore upon the right of Pierce to sue I T & T, as distinguished from his right to sue American Communications, Hewlett-Packard or Mackay. This was accordingly done, and such is the present sole issue, the issue on the merits, as to infringement, not even being ready for trial.

It will be noted from the above that the history of the several patents in question has been a long one, covering some 14 years after the applications were made and before the patents were issued, and some 16 years thereafter, previous to the filing of the complaint herein, this latter period covering both the years of peace immediately before and after World War II, as well as the duration of the war itself. During practically all this time, subject to lengthy intervals, the parties were in touch with each other, and under varying circumstances. In view of the many and varied facts involved, it will therefore be helpful to state the legal principles of laches governing the consideration of such facts.

■■ Basically the doctrine of laches is a principle of equity. The issue for the Court to decide is whether or not it is equitable to permit plaintiff's suit to proceed against defendant. Since the suit involves the rights of two parties, the Court must consider the rights of each—of plaintiff to obtain a remedy for an alleged wrong, of defendant not to be sued now, by one whose previous action, or inaction, has misled it. In other words, the court of equity must, as usual, balance against each other the equities of the adversaries. Accordingly, the action of plaintiff alone, in delaying the start of its suit, is not the sole criterion. Indeed, the Patent Act itself penalizes such delay, in preventing plaintiff from recovering from defendant any damages which plaintiff has suffered at defendant's hands previous to the last six years before suit filed, 35 U.S.C. § 286, 66 Stat. 813 (1952). Thus the longer, and, from the standpoint of time only, the more unreasonable, plaintiff's delay is, the greater will be his punishment under the statute.

But it is not the lapse of time alone that constitutes laches. The further question remains as to what else plaintiff has done, or failed to do, and how his action or inaction in that regard have adversely affected defendant. These factors, normally known as prejudice to defendant, are of equal moment with delay, in determining the existence of equitable laches.

■■ And so run the authorities. "While statements are to be found in some of the cases intimating that unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity, the generally accepted doctrine appears to be that laches is not like limitation a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the condition or relations of the prop-

938

erty or the parties." 2 Pomeroy's Equity Jurisprudence, 5th Ed., Sec. 419d, page 177. Indeed, the United States Supreme Court has stated that to constitute laches the defendant must have had good reason to think that plaintiff believes his asserted rights to be worthless or that he has abandoned them. Galliher v. Cadwell, 1892, 145 U.S. 368, 372, 12 S.Ct. 873, 874, 36 L.Ed. 738. In Westco-Chippewa Pump Co. v. Delaware Electric & S. Co., 3 Cir., 1933, 64 F.2d 185, 186, the Court says there "must be a balancing of equities * * * (1) lack of diligence on the part of plaintiff; and (2) injury to defendant due to the inaction of the plaintiff * * * ." Accord: Shaffer v. Rector Well Equipment Co., 5 Cir., 1946, 155 F.2d 344; Potash Co. v. International Min. & C. Corp., 10 Cir., 1954, 213 F.2d 153. "Mere lapse of time alone is not sufficient to establish laches." Searchlight Horn Co. v. Victor Talking Mach. Co., D.C.N.J.1919, 261 F. 395, 404; Valvona-Marchiony Company v. Marchiony, D.C.N.J.1913, 207 F. 380, 386.[1] In addition, " 'Where the party interposing the defense of laches has contributed to or caused the delay, he cannot take advantage of it.' " Howard v. Howe, 7 Cir., 1932, 61 F.2d 577, 580.

■ Furthermore, since 1934, the Congress, by creating declaratory judgment proceedings, 28 U.S.C. §§ 2201, 2202, 48 Stat. 955 (1934), has enabled a manufacturer to sue to protect his own rights, the minute there is good cause to believe there is an "actual controversy" as to his right so to manufacture. The alleged infringer thus holds the key to his protection in his own hand the minute he is served with notice of infringement. And thereafter, in the absence of a clear showing that the patentee, instead of claiming his rights, had actually abandoned them, the manufacturer proceeds to manufacture, and in-

vest, at his peril. Thus, since 1934, it should take more to prove prejudice to an alleged infringer than it did before. "The time has now passed when a patentee may sit by and refuse to show his hand. The defendant's putative uncertainties seem to us to have been of its own making." Clair v. Kastar, 2 Cir., 1945, 148 F.2d 644, 646; Salem Engineering v. National Supply Co., D.C.W. D.Pa.1948, 75 F.Supp. 993, 1000.

In the light of the above principles, we thus turn to the facts bearing on (a) plaintiff's delay, (b) prejudice to defendant.

### (A) Plaintiff's Delay

Prima facie this was indeed great. The patents relied on were granted in, and about, 1938. This suit was not begun till 1954. Even though Pierce is punished for such delay by his inability to claim damages for any of I T & T's acts before 1948, such a delay would seem unreasonable—in the absence of adequate excuse. So we turn to the consideration of the question of whether plaintiff's delay in suing defendant prior to the war, during the war, or thereafter, was or was not excusable.

### The Years Before The War

■ Following Dr. Pierce's patent applications in the 1920's or early 1930's, Pierce, at I T & T's request, not only opened up his secret papers to I T & T for their examination anent the possibility of its taking out a license thereunder, but he also permitted I T & T's representatives to visit his laboratory. In the complaint and at the trial the question was raised as to whether Pierce's above disclosures were confidential and whether such confidence had been breached by I T & T. But save as hereafter noted this would now seem largely immaterial. This is because all the facts as to Pierce's patents were dis-

---

1. Defendant's contention that Window Glass Machine Co. v. Pittsburg Plate Glass Co., 3 Cir., 1922, 284 F. 645; Banker v. Ford Motor Co., 3 Cir., 1934, 69 F.2d 665 and Dock & Terminal Engineering Co. v. Pennsylvania R. R. Co., 3 Cir., 1936, 82 F.2d 19 are to the contrary, is incorrect. Defendant has simply ripped a few words from their context. In each such case there was clear evidence of prejudice to defendant.

closed to I T & T and to the public generally when the patents were granted in 1938, and plaintiff now claims there was no infringement in fact by defendant until thereafter, i. e., in 1945 or 1946. After lengthy consideration, which I T & T stipulates to be largely due to "the complexity of the matter", including the preceding Cady and other patents covering the same general subject matter, I T & T decided in 1930 it was not at that time interested in taking out a license on the basic patent applied for in 1924, and so notified Dr. Pierce. Meanwhile Dr. Pierce proceeded to build up substantial licenses, with several of the largest electrical industries in the United States, including RCA and several others. Then in 1940, on being informed by an employee of the General Radio Company, one of his licensees, that the Pierce patents were being widely infringed, his counsel interviewed several of these large licensees, to see if they had any definite information in that regard. No such information was forthcoming. So Dr. Pierce, on advice of counsel, decided not to start suit. But when this same informant again, in early 1941, advised of his similar belief, showing an advertisement in an electronics magazine, listing 42 manufacturers of radio transmitters who were not Pierce licensees, plaintiff's counsel sent an infringement notice to all 42 such manufacturers, including two subsidiaries of I T & T, which the parties stipulate are to be considered as notices to defendant. In answer to these letters defendant's subsidiaries answered, stating that they were not infringing any valid claims of Dr. Pierce's patents, and that they accordingly were not interested at that time in acquiring a license.

Here it should be borne in mind that not so long before, I T & T had engaged outside patent counsel to advise it as to its rights in the matter, and that these counsel in 1939 had advised I T & T that "the Pierce patent * * * should be respected * * *", with certain exceptions here immaterial. It was not till 1945 that this counsel, plus other outside patent counsel, reversed this opinion, and advised I T & T that Pierce's basic patent in their opinion was invalid. Since I T & T was presumably guided by the advice of its patent counsel, it would therefore appear that not only during the pre-war period, but even up to 1945, I T & T had not in fact been infringing Pierce's patent, but had been using other processes or manufacturing for Pierce's licensees, as below indicated. Thus Pierce's conclusion during this pre-war period that, despite his infringement notice, he could not expect to prove actual infringement by I T & T, was apparently correct. Pierce is certainly excused, then, for not doing the unreasonable thing, of suing I T & T during this pre-war period—1938 to 1941.[2]

### The War Years

As noted above, up until July 1945, when I T & T's patent counsel reversed themselves and advised it that Pierce's basic patent was invalid, I T & T presumably had been following their advice to respect the Pierce patent, at least as far as private uses, disconnected with the Government, are concerned. As to the Government itself, since radio communications were of such tremendous importance, both by land and by sea, the United States Government had taken out a license under the Pierce patents, and had also set up a series of Governmental controls of radio broadcasting by ship, by private broadcasting station, and so on. For any war work for the United States, a licensee, the Pierce patent process could therefore be lawfully used. In fact, it is stipulated that from 1940 to 1950 I T & T did sell "the United States Govern-

---

**2.** Since both plaintiff and defendant had requested that the infringement issue be deferred till after the hearing on the laches issue, the Court complied therewith and refused to go into the infringement issue in full on the present hearing, despite its collateral involvement there-

in. Thus, if, on any hearing on the infringement issue, the evidence as to the beginning of I T & T's infringement should differ from the above, that might possibly require a reconsideration of the laches issue.

ment more than $170,000,000 worth of radio apparatus containing crystal controlled oscillators." But since these sales were to his own licensee, these obviously formed no basis for a suit by Pierce against I T & T.

Indeed, there were further strong reasons, both patriotic and practical, which properly moved Pierce not to sue I T & T at all during the war. For Pierce had other electrical patents than those here involved, as to which he had become involved in litigation with the Government and a private company during this time. In one of these, after much difficulty in bringing the case to trial, in the United States District Court for the District of Massachusetts, the Secretary of the Navy wrote a confidential letter to the presiding Judge, asking that the case be adjourned without date, because its trial would seriously hamper the war effort. Thereupon the Judge sent for Dr. Pierce, and had a confidential conference with him, after which the Court entered an order that the case "be stricken from its assigned date for trial and that it be continued until a change of circumstances will permit its trial without being detrimental to the war efforts of the United States Government." Essentially the same action was taken in a suit by Dr. Pierce against the United States, in the Court of Claims. That this repeated action by these courts constituted a sound exercise of discretion, or at least that Pierce might have justifiably delayed pursuing such litigation during the war, is demonstrated by the following authorities: Alliance Securities Co. v. DeVilbiss Mfg. Co., 6 Cir., 1930, 41 F.2d 668, 669; Victor Talking Machine Co. v. Cheney Talking Machine Co., D.C.Mich. 1920, 275 F. 444, 447, modified, 6 Cir., 1921, 278 F. 445; Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 1931, 49 F.2d 28, certiorari denied 284 U.S. 662, 52 S.Ct. 37, 76 L.Ed. 561; Harries v. Air King Products Co., D.C.E.D.N.Y. 1949, 87 F.Supp. 572, 588, affirmed, 2 Cir., 1950, 183 F.2d 158; Greyhound Corp. v. Rothman, D.C.Md.1949, 84 F. Supp. 233, 237, affirmed, 4 Cir., 1949, 175

F.2d 893; Acme Steel Co. v. Eastern Venetian Blind, D.C.Md.1950, 93 F.Supp. 233, 238, modified, 4 Cir., 1951, 188 F.2d 247, 254, certiorari denied 342 U.S. 824, 72 S.Ct. 43, 96 L.Ed. 623; Potash Co. of America v. International Min. & C. Corp., 10 Cir., 1954, 213 F.2d 153, 160. In the light of the above facts, it was not unreasonable for Pierce not to have sued I T & T during the war. Not only so, but in the light of the above authorities, to do so would probably have been fruitless. Since the law will not require a vain thing, Pierce's failure to sue I T & T during the war was proper, and in no way supports the defense of laches.

### The Post-War Years

■ It was of course some time after V. J. Day, in September 1945, before the nation, with all its outstanding war contracts, returned to normalcy. But we will assume the period in question runs from about January 1946 to the summer of 1951, when Pierce sued American Communications, I T & T's customer, for infringement of the patents in question, seeking to join Federal Telephone & Radio Corporation, one of I T & T's wholly-owned subsidiaries, as a defendant, which invitation I T & T refused to accept. But, particularly since I T & T, though it will not admit controlling such litigation, did pay for the services of counsel for defendant American Communications, and since this counsel was the special patent counsel of I T & T, who had first advised I T & T to respect Pierce's patents, and later advised it to ignore them, it is quite clear that in this suit Pierce faced all the opposition to his patents which American Communications could muster, with the cooperation, if not the control, of I T & T. Under such circumstances, having done his best to make I T & T technically a party, Pierce could not then be expected to start another suit against I T & T directly. He had done all that could be reasonably asked of him, to test out the validity of his patents, at least for the time being. Smith Hardware Co. v. S. H. Pomeroy Co., 2 Cir., 1924, 299 F. 544, 547, certio-

rari denied 265 U.S. 592, 44 S.Ct. 637, 68 L.Ed. 1196. As the Court said there: " * * * Delay in prosecuting other infringers, while the validity of the patent is in active litigation, does not constitute laches." See also Stearns-Roger Manufacturing Co. v. Brown, 8 Cir., 1902, 114 F. 939–945.

Thus we are now concerned only with what Pierce did, or failed to do, between January 1946 and June 1951, when Pierce started the American Communications suit. Undoubtedly, when I T & T failed even to reply to Pierce's attorney's second infringement notice, sent June 10, 1946, Pierce was clearly put on notice, in the light of all that had gone before, that I T & T was probably infringing the Pierce patents. During this period it is true that Pierce's attorney, Mr. David Rines, and his son, Mr. Robert Rines, recently out of the Army, did read a large amount of printed information in that field, collected in the library of the Massachusetts Institute of Technology, and did attempt to make inspections of the products of I T & T and its subsidiaries, as it existed at several conventions of the Institute of Radio Engineers. The younger Rines also wrote I T & T, requesting a circuit diagram, which apparently would alone show whether a Pierce circuit was used, rather than a Cady circuit, the latter information being refused by I T & T. A similar letter was written to the Farnsworth Television & Radio Corporation, another I T & T subsidiary, this information also being refused, I T & T asking for license terms, which were promptly furnished. But outside of this, of some inquiries of other Pierce licensees, and of the testimony that Dr. Pierce was unwilling to stoop to use detectives, little else was done by plaintiff to take action against the party whom he now had good cause to believe was an infringer.

Plaintiff says this delay was due to the fact that it was extremely difficult to differentiate, in the absence of a circuit diagram which it could not get, between a Cady circuit, the use of which Pierce could not attack, and a Pierce circuit, the use of which he could attack, and that Pierce therefore would not have been justified in suing on mere suspicion, without this definite proof. True I T & T doubtless used every possible means to secrete its circuit diagrams from Pierce, who had so freely showed I T & T all he knew about his own invention. Thus I T & T is in part responsible for this delay on the part of Pierce in making up his mind to sue. See Howard v. Howe, supra. But Pierce's claim that he was unwilling to sue on mere suspicion sounds a bit thin, in the face of the fact that he had but little more than this same suspicion, when he ultimately did sue American Communications in June 1951. In short, during these five or six years, Pierce would seem to have been a bit more dilatory in starting suit than he should, even if he were not, as I T & T claims, simply interested in receiving his substantial royalties from others as long as he could, without endangering an attack upon the validity of his own patent, by a suit which I T & T would doubtless defend on that ground.

However, as seen above, before one can be barred from bringing a suit at all on the ground of laches, and when every year that passes penalizes by loss of damages, it is necessary not only that plaintiff's delay be unreasonable from the standpoint of time, but also that such delay be unreasonable from the standpoint of actually prejudicing defendant.

(B) Defendant's Claim of Prejudice

We therefore turn to the question of whether this delay during this later period of 1946–51 actually prejudiced I T & T. Here we must bear in mind that, as seen above, I T & T had acted in a peculiarly secretive manner, particularly with respect to the man who, in previous years, had given it every assistance, in the form of access to secret documents and in personal visitations and conferences at his laboratory, to show I T & T exactly what his patented processes consisted of. For so much of this delay as was due specifically to this one-sided secretiveness, I T & T can not claim prejudice or resultant laches, as above noted.

Furthermore, since Pierce's repeated infringement notices to I T & T, plus his insistence on collecting substantial royalties under his patents from other outstanding manufacturers, showed clearly that Pierce was not abandoning his patent claims, and since I T & T had apparently only started to use Pierce's patented processes, after their outside counsel had reversed themselves, following the most careful study of the question, it is clear that I T & T knew they were proceeding on a matter which was a close question and which might well have most serious results. In short, they proceeded at their peril. For these perils, particularly with their full right at any moment to protect themselves by declaratory judgment suit, I T & T had only their own dilatory action to thank. Clair v. Kastar, supra.

Nor is the harm to I T & T by any means as great as it would claim. It lists a series of officials and others who have died during this entire period. However, only two or three of these individuals died during the period on which laches can be founded, i. e., 1946 to 1951. Nor is there the slightest evidence that any of these three could give important evidence, particularly in this patent suit, where infringement is the crux, and this mostly depends on documents and on the evidence of technical experts, of whom many exist. Indeed I T & T itself admits in its brief that the main detriment it claims is the possible damages it may have to pay Pierce, because of its sales of this kind of apparatus during that period. This immediately calls attention to the stipulated fact that I T & T has destroyed all its sales records in this regard. This destruction is all the more inexplicable, though stipulated to be pursuant to an established practice, since it occurred after Pierce had started the above suit against American Communications, I T & T's customer, in which Federal Telephone & Radio Corporation, a wholly-owned subsidiary of I T & T was named as a party defendant, and I T & T must thus have assumed

that it would soon be proceeded against by Pierce.

But even so, the stipulated figures on these sales to private users—whether of Cady or Pierce circuits is not clear—shows that during these latter years these sales had been much smaller than in the earlier years.

On the other hand, the general work of I T & T during this period was increasing greatly. Thus I T & T can not claim that it made heavy capital expenditures and built buildings, relying upon plaintiff's inaction, which will now be largely wasted, if plaintiff is permitted to sue, and wins. For, on its own figures, I T & T needed an ever-increasing plant during this period of alleged laches, and needed it even more thereafter. Finally, I T & T does not even claim wasted moneys, in the form of the construction, of a useless plant or otherwise, as its main detriment. It claims only that it will have to repay profits it previously pocketed from this possibly infringing manufacture. But, even so, this is no waste of money it would not have spent, had Pierce sued earlier. It is only taking out of its pocket illegal profits it previously put there, and repaying them to the one to whom they should have been paid in the first place.

■ In short, substantial prejudice to I T & T from Pierce's dilatory failure to sue it from 1945 to 1951 would seem lacking. It follows therefore that the defense of laches is dismissed.

■ This Court has not read the affidavit of Dr. Pierce, used in the above American Communications suit, as sought to be introduced here after his death by plaintiff, under Fed.Rules Civ. Proc. rule 43(a), 28 U.S.C. and by analogy F.R.C.P. 26(d) (3). Before the above rules were in effect, Rumford Chemical Works v. Hygienic Chemical Co., 1909, 215 U.S. 156, 30 S.Ct. 45, 54 L.Ed. 137, held that in patent litigation, where there was no privity between the party against whom the evidence was offered in the first case and the party

against whom the evidence was offered in the second case, it was error to have admitted it in the second case. However, under Rule 43(a) this Court now has a duty to admit evidence which is admissible " * * * under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity [as in Rumford], or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States Court is held." (Parenthesis the Court's.) Thus if Dr. Pierce's affidavit in the first case would have been admissible in this case, were it tried in the New Jersey State courts, this Court would be under a duty to consider it here, despite Rumford. Had Dr. Pierce's affidavit been real evidence, subject to cross examination in the first case, and had it been introduced in the second case against the same party against whom it had been introduced in the first case, it undoubtedly would have been admissible in the New Jersey State courts, and therefore would be admissible in this cause. Welch v. Essex County, 1949, 6 N.J.Super. 422, 68 A.2d 787 affirmed 6 N.J.Super. 184, 70 A.2d 779; Hagerman v. Lewis Lumber Co., 1952, 24 N.J.Super. 120, 93 A.2d 632; Mid-City Bank & Trust Co. v. Reading Co., D.C.N.J.1944, 3 F.R.D. 320.

But none of these conditions exist here. There was no cross examination whatever. Indeed, there is real question if this affidavit can be considered as ordinary evidence to which the above principles apply. Nor were the parties against whom it was offered the same or in privity in the two cases. In addition, there is real question if this right of cross examination was waived, and even if it was, it is questionable whether waiver by one party can bind a different party not in privity. Lacking this prime safeguard of adequate cross examination, Dr. Pierce's affidavit in the American Communications suit should not be admitted here.

## Mackay's Application to Intervene

Literally on the eve of trial of the laches issue in the instant suit, Mackay, a wholly-owned I T & T subsidiary, applied to intervene herein.

However, even before the instant suit was started, Pierce had sued Mackay in the United States District Court for the Eastern District of Massachusetts on the very same patent infringement issues. Were Mackay and I T & T interested in lessening litigation, I T & T would doubtless then have applied to intervene in the earlier Mackay suit in the First Circuit, instead of Mackay's applying at this late hour to intervene in this later suit against I T & T here. An added reason for I T & T to have done so, would seem to be the fact that the most important of these same patent infringement issues has already been decided in the First Circuit against Pierce, and in favor of American Communications, I T & T's customer, represented by I T & T's special patent counsel, whose services in that suit were paid for by I T & T. Thus neither Mackay nor I T & T are apparently interested in lessening litigation over these same patent infringement issues—that is, unless I T & T, now faced with the necessity of trying these same issues on the merits here, decides to intervene in the earlier Mackay suit there.

Of course if I T & T does this, then clearly this Court, having jurisdiction only over the latest suit, should stay its hand, awaiting the adjudication of these same issues in the Court which has jurisdiction over the earliest suits, particularly with one of these suits in great part decided. Furthermore, even if I T & T should not do this, but should insist on having this Court decide an issue again which has already been generally decided in the First Circuit, though with a different party, it would seem more appropriate for Mackay to be left to its remedy in the First Circuit, in the suit prior in time, where a ready decision would seem available, under the principles already applied by the United States District Court for the Eastern

District of Massachusetts in Pierce v. Hewlett-Packard, supra.

In short, Mackay appears to be using this intervention procedure, not to become a party to a suit in which it has the primary interest, involving a question which it can not otherwise have decided, but simply to obtain a change of venue from a court having earlier jurisdiction over it to another court now having no jurisdiction over it. "The record discloses no foundation for the claim that the defendant sued is not, or that the intervener is, the real defendant in interest." Chandler & Price Co. v. Brandtjen & Kluge, Inc., 1935, 296 U.S. 53, 57, 56 S.Ct. 6, 8, 80 L.Ed. 39.

Mackay's application to intervene will accordingly be denied.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by F.R.C.P. 52.