FRANCES B. STRAVER, petitioner,

*v.*

DANIEL STRAVER, defendant.

[Decided April 7th, 1948.]

*Messrs. Riker, Marsh & Scherer (Mr. Everett M. Scherer, appearing), for the petitioner.*

*Messrs. Coult, Satz, Morse & Coult (Mr. David M. Satz, appearing), for the defendant.*

FRANCIS, A. M.

On October 8th, 1946, the defendant filed a petition seeking modification of the provision of a divorce decree which required him to pay to his former wife the sum of $20 weekly for the support of the infant child of their marriage.

The decree *nisi* in the divorce action between the parties was entered January 7th, 1932. By it the petitioner, then Mrs. Straver, was granted a divorce on the ground of adultery. She was awarded the custody of Joyce Faith Straver and $20 a week for her maintenance. The child was then two years of age. The decree contained no provision for visitation by the father. Whether this was an oversight or by design does not appear, although it is plain that the parties had some specific understanding under which the father could see his daughter at regular intervals.

The application for reduction was argued and on October 29th, 1946, an order was entered reducing the allowance to $7 per week, effective retroactively to July 1st, 1946. The July date was chosen apparently because the affidavit of defendant in support of the petition to modify was made on that date. An appeal was taken and the Court of Errors and Appeals reversed (140 *N. J. Eq.* 480; 54 *Atl. Rep.* (2d) 925) saying that examination of the affidavits "leads us to the conclusion that they did not present sufficient facts upon which to base the order appealed from." And further that due process of law would best be satisfied if the issue were

determined in an orderly procedure on due notice and oral proofs.

Following the *remittitur,* rehearing was had on the affidavits and on such oral proofs as the parties cared to submit. Previous to the rehearing an order was issued which required the defendant to show cause why he should not be held in contempt for failure to pay the weekly allowance of maintenance of $20 from July 1st, 1946, and for failure to pay a balance due on counsel fees and costs of $153.51.

At the close of the hearing leave to file briefs was granted. The defendant's brief presents two contentions: (1) that the payments should be reduced from $20 to $7 weekly for the period from July 1st, 1946, to May 24th, 1947, and (2) that as of May 24th, 1947, all payments should cease because on that day the infant child of the marriage reached the age of eighteen years and became emancipated.

The July 1st, 1946, date is used by Straver because the arrearages sought to be recovered in this proceeding begin as of that time. It seems to be uncontradicted that between 1933 and 1939 he made no payments under the decree, but from 1939 on to July 1st, 1946, the over all average of the payments was about $20 weekly. So far as the record shows, no effort was made to enforce the decree between 1933 and 1939. The explanation offered by Mrs. Straver (now Fagan) is that she knew Straver was in financial difficulty and, consequently, she did not press him.

### The Alleged Agreement to Accept $7.00 Weekly.

The defendant contends that long prior to July 1st, 1946, an agreement was made whereby the petitioner agreed to accept $7 weekly for the support of their child, and that the $20 weekly allowance in the decree *nisi* should be reduced to that amount from July 1st, 1946, to the date of the infant's eighteenth birthday. Petitioner emphatically denies the making of any such agreement. She says that during the depression years no payments were made to her. Then in 1939, on discussion of the matter, Straver asked her to take $7 weekly,

which he would pay regularly and which sum she could always count on. Then he would make such payments in addition at intervals, which would, on an overall basis, average out to the required $20.

In the petition for modification Straver asserted that some time after the remarriage of his former wife she removed to New York City with their child "with the understanding that the said child would only require the payment of $7 per week." In the supplemental affidavit, filed after the order appealed from was entered, he said: "My wife and I were under the impression that the decree *nisi* provided for payments of $25 per week until such time as petitioner remarried and in which event the payments were to be $7 per week, which amount your deponent has paid regularly through the years." At the hearing he testified substantially to that effect, saying (without reference to the decree *nisi*) that on petitioner's remarriage it was "our impression" that the payments were to be $7 weekly.

The conduct of Straver down to the filing of the application to revise the decree belies the making of any such agreement, and supports Mrs. Fagan's assertion of their arrangement. Both parties concede that the total sums paid for support met the requirement of the order for $20 a week. Furthermore the answering affidavit of Mrs. Fagan on the application to reduce the award, recites that in May, 1945, he ceased payments and she obtained an order to show cause why he should not be adjudged in contempt. Following the service of this order "and after negotiation he, in June, 1946, paid up his arrearages at the rate of $20 per week." This statement is admitted.

Petitioner put in evidence a check of the defendant dated March 25th, 1946, in the amount of $264.50, which bears in the lower left-hand corner the following notation:

$244.50
20     weekly
—————
$264.50

Defendant places much emphasis on a number of references. in letters received from petitioner to $7 weekly payments. However, her explanation of the arrangements between them seems a reasonable one, particularly in the light of payment. of an average of $20 weekly from 1939 to July 1st, 1946. Nor can it be overlooked that at no time was an order ever entered modifying the decree *nisi* from $20 to $7. It seems to me that if such a reduction had been agreed upon, the defendant would have litigated the question when the contempt proceedings were brought against him early in 1946. Payment of the arrearages in full at that time is strongly indicative of absence of such an agreement.

In my judgment the weight of the evidence is against the defendant on this point and I find that there was no such agreement.

### EMANCIPATION OF THE INFANT DAUGHTER.

Joyce Straver reached the age of eighteen years on May 24th, 1947. The defendant says that this fact, plus others. to be alluded to presently, demonstrates that she has become emancipated. Consequently he should be relieved of the duty of further support. There is no age fixed in the law when a child becomes emancipated. Prior to twenty-one years there is a presumption against it, and the burden of establishing the status by competent evidence in on him who asserts it. *Cafaro* v. *Cafaro*, 118 *N. J. Law* 123; 191 *Atl. Rep.* 472. Even "arrival at the age of twenty-one years, does not, *ipso facto*, result in emancipation. Arrival at majority is *prima facie*, but not necessarily emancipation." *Goldstein* v. *Goldstein*, 4 *N. J. Mis. R.* 711; 134 *Atl. Rep.* 184.

In recognition of the presumption against the emancipation of a minor, Vice-Chancellor Gray, in *Wilson* v. *Wilson*, 41 *Atl. Rep.* 355-356 (not officially reported) in fixing support for an infant daughter said:

"For the support of the girl, that is to continue for a long while, and the order (unless some occasion for change appears) will last from this time when the girl is ten years of age until she comes to be twenty-one; that is eleven years."

In an effort to meet this burden, the defendant, in addition to pointing to her age, says that his daughter has relinquished the use of his name, and is known as Joyce Fagan, that she has become estranged from him, and that she denies filial obedience to him, particularly because she refuses to give up school and become self-supporting. With respect to the use of her step-father's name, Fagan, the proof establishes that she has been known as Joyce Fagan since she was four years old, and I am convinced that the assumption and continued use of the name was with the acquiescence of her father.

The estrangement between them is a condition which has grown over a period of years. It is, unfortunately, an all too common result of homes destroyed by divorce. It arose here through grievances about support, about clothes, about education and because of the father's feeling that his daughter should become self-supporting. The daughter testified that the defendant told her that when she became sixteen years of age he would disown her because she was not a good daughter and that he would not support her after that age. This is denied by him, but it is significant that she reached sixteen years on May 24th, 1945, and he ceased payments on May 21st, 1945. Thereafter he did not comply with the support order until contempt proceedings were instituted.

Joyce Fagan testified that she ceased seeing her father in June, 1945, and has not visited him since. She said she doesn't want to see him anymore. On the father's part, he has made no inquiry about the cessation of the visits and has made no effort to have them resumed.

It must be kept in mind, in connection with the problem of emancipation, that the petitioner has the custody and control of this child. The child lives with her, is subject to her parental domination and is still attending school. No one suggests that she is emancipated from her mother and where, as here, the control of the mother is the vital factor, there can be no emancipation in the absence of relinquishment or loss of that control.

What the defendant is really saying here is that his daughter is now old enough to go to work, to become self-suporting,

that he is under no duty to furnish her with a college education and that, if she refuses to accept employment, he should not be obliged to support her. This contention is based on the ancient doctrine that a father who supports his child is entitled to her services. However, in modern times this rule must be subject to the qualification imposed by custody orders in divorce cases.

It seems to be the established law of New Jersey that a father is under no duty to provide a college education for a son or daughter, and this regardless of his financial capacity, *Streitwolf* v. *Streitwolf*, 58 *N. J. Eq.* 570; 41 *Atl. Rep.* 876; 43 *Atl. Rep.* 683. In our case the petitioner, who has custody of the child under the order of this court is not seeking to impose on the father the cost of college education. She simply asks that he continue to support his daughter according to that order, while she assumes the burden of the tuition. When an order is made giving the custody of a child to a mother, there must be implicit in the order a grant of sufficient control to make the custody effective. In my judgment the mother in such a case is invested with the discretion to determine whether or not the child should receive education beyond that which is mandatory under the law. Having made a determination that the advanced education should be given, even though the cost thereof cannot be assessed against the father, his duty to maintain the child, having regard to her reasonable needs and to his financial condition, continues to exist. Petitioner had decided that her daughter should attend college. Such decision is her right under the custody order, and the defendant will be required to provide reasonable support, exclusive of the education cost, gauged by her needs and his means.

It might be urged that, under such a doctrine, a mother could permit her child to remain a student indefinitely beyond her majority, and force the father to provide support so long as he has the means to do so. However, no effort is being made to lay down an all inclusive rule. Each case will have to be determined on its own facts, and the attainment of majority with its concomitant presumption of emancipation will always be one of the vital facts.

Accordingly, as to the defendant's second contention, I find that the daughter of the parties is not now and was not emancipated on May 24th, 1945, her eighteenth birthday.

The real issue between the parties here is the amount the defendant should pay for the support of his child, having in mind her needs and his financial capacity.

In the defendant's orginal affidavit of July 8th, 1946, in support of his application for revision of the decree *nisi*, he said his income had been reduced to $3,000 less unspecified office expenses, that he had been obliged to borrow $1,500 on "the equity of $3,500 which he has in real estate." He mentioned also his interest in The Panda, Inc., a tavern which, he said, was then "subject to being closed due to accidental circumstances." No reference was made to previous earnings from this tavern.

In this same affidavit he asserted that prior to January, 1946, his daughter had been demanding a fur coat. At this time he suggested (as appears by his second affidavit) that at the end of the school year (which would be June, 1946) she take a position with the insurance company he represented or in his office, where she could earn $18 a week. If she did this, he would give her an additional $18 a week as a gift. This statement does not indicate a consciousness of a declining adjustment business or of an inability to comply with the maintenance order.

In 1944 he acquired an interest in a supper club in Newark known as "Pat & Don's" for $3,000. The affidavit says the "greater portion" of this money was borrowed. This interest was sold within a year for the same sum. However, no statement appears as to just what portion of this money was actually his, or what he did with it thereafter.

In October, 1944, he bought an interest in The Panda, Inc., for $3,500. He said that between October, 1945, and October, 1946, he paid $2,900 of this amount in weekly installments, leaving a $600 balance which was still due on the date of the second affidavit, January 7th, 1947. It is difficult to believe that if this $3,500 was borrowed money, no payments were made on the loan between October, 1944, and October, 1945. In any event the asserted payments indicate

an income from some source of approximately $60 a week for the year October, 1945, to October, 1946. In addition, at the hearing in February, 1948, he testified that he had a $4,500 investment in The Panda, which means that somehow another thousand dollars of his money had filtered into the business.

In July, 1946, he borrowed $5,000 from the Fidelity Union Trust Company of Newark on collateral owned by his sister. Since that time $1,000 had been paid on the note out of Panda receipts.

In petitioner's affidavit the allegation is made that the defendant gave a financial statement to Dunn & Bradstreet on December 17th, 1945, to the effect that the fixtures and furnishings of The Panda were worth $40,000 and that the weekly sales were approximately $700. This assertion is not denied, nor is the statement produced.

According to Straver's testimony, he had a $6,000 investment in a supper club before he went into The Panda. The place or his interest therein was sold in March, 1945. What happened to the money is not shown.

In 1946 he sold two pieces of real estate for $12,500. The purchase price was $9,500. The record is not clear as to what portion was profit nor as to what was done with the profit.

It is conceded that he has been paying $50 a month in liquidation of a loan secured by his automobile. This money Straver said is advanced by his wife, who likewise pays their rent of $50 a month. His wife earns $50 a week. Whether this is gross or net to her, does not appear. Assuming it to be net, if Straver is earning nothing, then he and his wife are living on $100 a month, which is very questionable.

It appeared that Straver had done appraisal work for the Commercial Casualty Insurance Company for a number of years. He testified that he lost the business because of unfavorable publicity about his being an alien. This noncitizenship became known in the Alcohol Beverage Control Board proceedings and my notes indicate that The Panda was closed from October 15th to December 15th, 1947, as the result thereof. If this publicity in fact cost him the appraisal

work, then it wasn't until the end of 1947, and no books or records are presented to show what the earnings were from that source until the loss occurred.

The office from which this appraisal work was conducted is still in existence, and Straver's brother is said to be receiving some of the work. Straver's name is still on the door of the office, although he said this is just an accommodation. How the brother happened to succeed the defendant in the business, or whether there was some connection between them and the insurance companies before Straver's alleged difficulties is not explained. The brother was not produced, nor was anyone from the insurance company produced to confirm the loss of the business.

According to Straver, he is now the general manager of The Panda and he has no other business. He says that since July 1st, 1946, he has received only $300 as earnings from this source. Despite this he has sought no other employment. No books or records of The Panda are produced and Straver's statement is the only proof of its financial trouble. It is fairly inferable from the testimony that this tavern has been paying his purchase money obligation and installments on his Fidelity Union Trust Company note, and that his interest is greater than the ten per cent. he asserts.

Under all of the circumstances it is my opinion that the defendant has not sustained the burden of establishing that the decree *nisi* should be modified so as to reduce or cancel his obligation to support his child. The defendant will be required to satisfy the arrearages and continue payment at the rate of $20 weekly for her maintenance.