ESTATE OF FREDERICK J. McTIGHE (DECEASED), FIDELITY UNION TRUST COMPANY, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of McTighe v. Commissioner
Docket No. 2983-75.
United States Tax Court
T.C. Memo 1977-410; 1977 Tax Ct. Memo LEXIS 31; 36 T.C.M. (CCH) 1655; T.C.M. (RIA) 770410; November 29, 1977, Filed Herbert M. Gannet and Harvey R. Poe, for the petitioner. James F. Kearney, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined a deficiency in estate tax for the Estate of Frederick J. McTighe in the amount of $52,386.08. Some of the issues raised by the pleadings have been conceded by the parties, leaving for our decision: (1) Whether all or any part of the corpora of three trusts created by the decedent are includable in his gross estate pursuant to sections 2036 and 2038, I.R.C. 1954; [1] and (2) the determination of the fair market value at the date of death of certain shares of stock owned by decedent. All of the facts have been stipulated and are found accordingly. Frederick J. McTighe (hereinafter decedent) died on April 10, 1971. The executor of his estate is Fidelity Union *33 Trust Company, a corporation whose principal place of business at the time of filing the petition herein was in Newark, New Jersey. The executor filed a Federal estate tax return for the estate with the District Director of Internal Revenue, Newark, New Jersey, on January 10, 1972. The return reported a gross estate of $935,903, and estate tax in the amount of $226,098 was paid thereon. In 1951, decedent established a trust for each of his children, Beverly, Judith, Edward and Martin. He established a trust for his fifth child, Frederick, in 1963. The terms of all of these trusts were substantially the same. The trust for Beverly was terminated pursuant to the terms of the trust when she reached the age of 35, at a time prior to decedent's death. The trust for Judith was also terminated and its corpus distributed in 1964 or 1965 prior to decedent's death, but at termination Judith was only 26 or 27 years old. On the date of decedent's death, the values of the remaining trusts for Edward, Martin and Frederick were $26,853.11, $20,053.11 and $18,524.00, respectively. Beverly, Judith, Edward and Martin were all adults at the time of decedent's death. Frederick was 18 years *34 and 9 months old on that date. The trust for Frederick made no distributions to him from its establishment in 1963 through the date of decedent's death. On the latter date, Frederick was in high school and not working. After the death of decedent's wife Virginia, both decedent and Frederick lived with decedent's daughter Beverly, at Beverly's home. Each of the trust instruments named decedent's wife, Virginia McTighe, as trustee. In article V of each instrument, decedent reserved the power to substitute another or different trustee in accordance with the terms of that article. Virginia McTighe predeceased decedent, and upon her death Beverly McTighe was appointed trustee. Each of the three trusts in existence at decedent's death provided in pertinent part: THIS AGREEMENT made the * * * day of * * *, by and between FRED J. McTIGHE, residing at 22 Heathcliff Road, in the Borough of Rumson, County of Monmouth and State of New Jersey, Hereinafter called the "Grantor", And VIRGINIA McTIGHE, residing at 22 Heathcliff Road, in the Borough of Rumson, County of Monmouth and State of New Jersey, hereinafter called the "Trustee": WITNESSETH THAT: I. The Grantor, being desirous *35 of providing for his child * * * a means of establishing himself to a degree of financial independence and as a gift to him and in consideration of the sum of $1.00 to him in hand paid by the Trustee, the receipt whereof is hereby acknowledged, and in further consideration of love and affection for the beneficiary of this Trust, has delivered to the Trustee the property or sum of money itemized on the schedule attached hereto, marked Schedule "A", and hereby made a part hereof, which property and sum of money, together with any other property or properties or sums of money or other things of value that may hereafter be delivered by the Grantor to the Trustee, or otherwise brought within the operation of this Agreement, are to be held by the Trustee or her successors in trust for the purposes and under the conditions hereinafter set forth. II. (a) The Trustee shall receive, hold, manage, convert, sell, assign, alter, re-invest and otherwise deal with the above mentioned property and any additions thereto as in her discretion shall seem meet for the best interests of the beneficiary hereunder to the same extent as the Grantor might deal with the said property.
(b) The Grantor hereby *36 authorizes the Trustee: 1. To hold and retain the original property received by the Trustee from the Grantor and any additions thereto hereafter received by her for such time as to her shall seem best and to dispose of them by sale, exchange or otherwise as and when she shall deem advisable. 2. To acquire by purchase, exchange or otherwise other property from the Grantor or others and to hold the same as long as it shall seem advisable to the Trustee. 3. To participate in the liquidation, reorganization, consolidation, merger or other financial readjustment of any corporation, partnership or business in which this trust estate is or shall be financially interested and in connection therewith to subscribe for stock and rights and privileges in stock or other participation in such corporation, partnership or business interests. 4. To determine what expenses and other charges shall be charged against the principal of the trust estate and what portion shall be charged against the income thereof and to pay such expenses as may be reasonably incurred in and about the management and administration of this trust. 5. To acquire, own, hold, mortgage, sell and dispose of for *37 the benefit of this trust, real estate without limitation. 6. To invest the trust fund or any part thereof in such manner and in such securities as the Trustee may deem advisable, including the purchase of an interest or interests or share in any business partnership, notwithstanding that such investment may not be legal investment for fiduciary funds in the State of New Jersey and to hold any such investments as may be placed in the trust estate by the Grantor. 7. To borrow money for the benefit of the Trust estate, and, if required to do so, secure the same by pledge of collateral or mortgage. 8. To compromise, arbitrate or otherwise adjust claims in favor of or against the trust estate. 9. To execute deeds, contracts, bills of sale, stock transfers, notes and other instruments, in writing, as may be required for the administration of the trust. 10. To receive all rents, profits and income of every nature and kind which may be due or become due to the trust estate. 11. To pay out of the income received, from time to time, such sums as may become due to any governmental authority or agency for taxes upon the income of this trust or upon the income of the beneficiary *38 as a result of this trust or any other taxes that may be imposed upon this trust or any property constituting a part of this trust. 12. Generally to deal with the said trust estate as fully and freely as the Grantor herein might do with his own unrestricted property. III. (a) The income received by the Trustee from the property constituting the trust estate shall be accumulated by the Trustee and added to the principal of the trust, except as hereinafter provided, until the beneficiary * * * shall arrive at the age of 35 years. At that time the principal and accumulated income of this trust shall be delivered and paid over to the said beneficiary. (b) In the event that my son, * * * the beneficiary of this trust, does not survive to the age of 35 years and if he should leave a child or children surviving him, then this trust shall continue for the benefit of such child, and if more than one, then in equal shares for the benefit of such children, until each shall arrive at the age of 21 years. Thereupon and as each child arrives at the age of 21 years the Trustee shall pay over, deliver and convey the equal share or shares of the remainder of the trust estate, together with *39 the accumulated income, to such child or children or the survivors or descendants of them. (c) In the event that my son, * * * the beneficiary of this trust, does not survive to the age of 35 years, and if he does not leave any child or children surviving him, then upon his death prior to attaining the age of 35 years, the remainder of this trust and any accumulated income shall be paid over, conveyed and transferred in equal shares to [trusts for decedent's other children] * * * and shall become part of those trusts respectively to be administered as therein set forth and thereupon this trust shall terminate. (d) Notwithstanding the provisions hereinabove set forth for the accumulation of income, the Trustee is specifically authorized to use the incoem, current or accumulated, if in her judgment it is necessary or advisable for the purpose of providing for the support, maintenance or education of the beneficiary or beneficiaries of this trust. If the beneficiary for whose benefit such payments of income is to be made is of full age, the Trustee is hereby authorized to pay such sums as she deems necessary for the purpose directly to such beneficiary, or she may in her discretion, *40 and if the beneficiary is not of full age, she shall, pay such sums to the person or institution providing the education or maintenance and support or to the person standing in Loco Parentis to the said minor. (e) Should any part of this trust estate vest in absolute ownership in a minor, I authorize my Trustee in her sole, absolute and uncontrolled discretion in each or any such case to hold, administer, invest and re-invest such part for such minor's benefit during his or her minority, and to apply as much of the net income and such part of the principal of such share as my said Trustee, in her sole, absolute and uncontrolled discretion, shall deem necessary to such minor's proper care, maintenance, support and education, and to make payment therefor to the legal guardian of such minor or to the person with whom such minor may reside, or directly to such minor or otherwise as my said Trustee may, from time to time, deem expedient, and to accumulate, for the benefit of such minor, any income not so applied or paid; but this authority shall be construed as a power only and shall not operate to suspend the absolute ownership of such share or of such accumulations of income, if any, *41 of such minor, or to prevent the absolute vesting thereof in such minor. (f) In addition to the purposes specified hereinabove for which the Trustee may apply the income of this trust, the Trustee, is also authorized to use the income of the said trust for the purpose of paying any premium or premiums on any life insurance policy owned by any minor beneficiary hereof and to pay such premiums either as they become due or in advance at a discount. IV. The Grantor, after full and complete consideration, and after consultation with his legal advisor, declares that this trust shall be irrevocable and that no rights of any kind are retained by him in the trust or in the property transferred to and comprising the trust, the same being an unconditional gift, but the Grantor may hereafter make other and further gifts to this trust which other and further gifts shall then be governed by the terms of this trust and which gifts shall likewise be irrevocable.The right to substitute another Trustee shall in no wise affect the irrevocability of the trust. V. The Grantor reserves to himself the right, with or without cause, to substitute another or different Trustee, either an individual *42 or a corporate Trustee, in the place of the one herein named and, to facilitate only the administration of this trust, to amend and supplement this indenture of Trust but no such amendment or supplement shall affect the irrevocability of the gifts made to this trust. A successor Trustee or Trustees shall be, by virtue of such succession, vested with full title and ownership of all assets of the trust, real or personal, and shall have the same rights, powers, duties, privileges and immunities herein conferred upon the presently named Trustee. The power of substitution, amendment and supplementation shall, in case of the death of the Grantor before termination of this trust, devolve upon the Grantor's executors or administrators, as the case may be. VI. The Trustee shall not be held liable to the trust or to the beneficiary or beneficiaries for any act or thing done in good faith, nor for any loss that may be sustained by the trust by reason of the investment of the funds of this trust in any security, loan or investment not legal for trust funds nor for any failure to foresee the consequences of any act or thing done in the management of the trust. VII. The Trustee reserves *43 the right to resign this trusteeship upon giving to the Grantor, if living, and if not, then to the Executors or Administrators of the Grantor, as the case may be, ninety day' notice in writing and within said ninety days presenting to the Grantor, or his Executors or Administrators, a full and complete account of her transactions as such Trustee and a statement in detail of the assets and liabilities of the Trust. VIII. The Trustee is specifically authorized to open a deposit account or accounts in a Bank or Trust Company to be selected by the Trustee and to deposit therein the funds so held by her in trust and to withdraw from the said account or accounts such sums of money from income or principal, from time to time, for the benefit of the beneficiaries of this trust and for the purpose of investing the same and the Bank or Banks where said accounts are or may be located shall be authorized to pay such checks drawn by the Trustee without inquiry as to the disposition of the funds and irrespective of the person to whom any checks may be payable, including the Trustee personally. IX. This trust is made and accepted in the State of New Jersey and all questions as to its construction, *44 validity and administration shall be determined in accordance with the laws of the State of New Jersey, notwithstanding the domicile of any of the parties or the beneficiary, nor the situs of any of the property in the Trust estate. X. No compensation shall be paid on income to the Trustee initially appointed for the management of the trust, and on final distribution only such compensation as may be allowed by a Court of competent jurisdiction which may pass upon the account, and then not to exceed five per cent of the corpus of the trust. XI. This trust shall terminate upon: 1. The arrival of my son, * * * at the age of 35 years and the payment of the principal thereof to him, or 2. If he has not arrived at the age of thirty-five (35) years but has left a child or children surviving him, then upon the arrival of his youngest child at the age of 21 years and the final payment of the remainder of the trust to his child or children, or 3. If my said son has not survived to the age of 35 years and has no child or children durviving him, then upon distribution to the remaining trusts established * * *, for my other children, or 4. If there be no takers living as set *45 forth in this trust, then upon final distribution to those who would take from the last surviving beneficiary. Such termination, however, shall not terminate the rights and powers of the Trustees thereafter in the event that some asset should later come to light or some act or thing remain to be done for final liquidation of the trust, in which case, the Trustee shall continue clothed with all the power and rights necessary to finally administer the trust. At decedent's death the owned 30 shares of Stirling Building Co., Inc. (hereinafter Stirling), which was all of the outstanding stock of that corporation. Stirling was in the business of managing and renting real property. On the date of decedent's death, April 10, 1971, the corporation's assets were: Asset
Fair Market Value
Cash
$ 4,058.71
Mortgage Receivable
55,500.00
Real Property
91,500.00
Total
$151,058.71
Its liabilities included: Liability
Amount
Security Pledged
$ 1,987.50
Notes and Loans Payable
21,559.29
Reserve for Taxes
1,265.12
Accrued Expenses
325.00
Total
$ 25,136.91
The balance sheet prepared by petitioner for the purpose of valuing Stirling listed the *46 above items and also included as a liability an item of $24,977.49 listed as "Other Liabilities." The estate tax return filed for the Estate of Frederick J. McTighe disclosed the existence and origin of the five trusts established by decedent for his children, but they were not included as part of decedent's gross estate. Also, the 30 shares of Stirling owned by decedent were included in his gross estate at a value of $70,661 or $2,355.36 per share. In his notice of deficiency mailed to petitioner, respondent determined that the values of the assets of the trustsestablished for decedent's sons, Edward, Martin and Frederick, were includable in decedent's gross estate pursuant to sections 2036 and 2038. Respondent further determined that the fair market value of the Stirling stock on the date of decedent's death was $4,014 per share or $120,420 for the 30 shares. Respondent has included in decedent's gross estate under sections 2036(a)[2] and 2038(a)(1)[3] the value of three trusts in existence at decedent's death. Respondent urges that the value of all three trusts is includable under sections 2036(a)(2) and 2038(a)(1). These sections require the inclusion in a decedent's gross *47 estate of property that the decedent has gratuitously transferred in which he retained the right to designate the persons who would possess or enjoy the property or its income or in which he had a power to alter, amend, revoke or terminate through which he could affect the enjoyment of the property. Alternatively, respondent urges that the value of the trust established for decedent's son Frederick is includable in decedent's gross estate under section 2036(a)(1), which requires inclusion when the decedent retains "the possession or enjoyment of, or the right to the income from, the property." *48 Because decedent had no rights or powers in his individual capacity, respondent's position is premised on his conclusion that decedent possessed the right to name himself trustee and to assume rights and powers in that capacity. Article V of the trust instrument provided that "The Grantor reserves to himself the right, with or without cause, to substitute another or different Trustee, either an individual or corporate Trustee, in place of the one herein named * * *." The regulations under both sections 2036 and 2038 provide that if a decedent has the unrestricted power to remove a trustee and appoint himself trustee the decedent is considered as having the powers of the trustee. Sections 20.2036-1(b)(3) and 20.2038-1(a)(3), Estate Tax Regs. See also Mathey v. United States,491 F.2d 481, 485-86 (3d Cir. 1974). Furthermore, powers over property, even though held only as a trustee, may result in inclusion of that property in a decedent's gross estate. See United States v. O'Malley,383 U.S. 627 (1966). Petitioner, however, argues that decedent did *49 not have the power to substitute himself as trustee under article V, relying on Durst v. United States,     F.2d     (3d Cir. 1977). In the Durst case, the trustees of a trust established by a decedent were conceded to have held powers that could cause inclusion of the trust property in the decedent's gross estate if they were held by him. Also, the settlor retained the right during his life to appoint an additional trustee. The issue thus arose whether the decedent had the power to appoint himself a trustee under the trust instrument. The district court had examined the instrument, which did not by its terms exclude self appointment, and had found that in fact self appointment was precluded under the trust when construed as a whole in light of the circumstances surrounding its execution and of certain admissible extrinsic evidence. The Court of Appeals affirmed on this basis noting "that the power of self-appointment need not be expressly withheld * * * so long as under the controlling state law the power of self appointment would not be permitted under the terms of the trust *50 indenture." Whether decedent retained the power to appoint himself trustee is to be determined by reference to state law, here the law of New Jersey. Durst v. United States,supra. See also Mathey v. United States,supra.Under that law construction of the trust depends upon the intent of the settlor. The primary inquiry in this regard is directed to the language of the instrument itself. But the instrument must be viewed "as a whole in order to see if it evinces a 'dominant plan and purpose' when read in the light of the surrounding circumstances, ascribing to the settlor those impulses 'common to human nature' and considering the competent extrinsic evidence as to the settlor's intent." In re Voorhees' Trust,93 N.J. Super. 293, 225 A.2d 710, 714 (1967); see In re Burke,48 N.J. 50, 222 A.2d 273 (1966). In the Durst case, self appointment was deemed inconsistent with the language of certain trust provisions and contrary to inferences drawn from admissible extrinsic evidence. In the instant case petitioner produced *51 no extrinsic evidence bearing directly on the settlor's intent as was produced in Durst. Petitioner argues that the terms of the trust and particularly those of article IV, stating that "no rights of any kind are retained by * * * [the settlor] in the trust," clearly show decedent's intent to preclude self appointment. We do not view the emphasized phrase as supportive of petitioner, however.Since decedent clearly retained certain "powers" or "rights" over the trust and its administration in article V, article IV could not have been intended to cause the categorical preclusion suggested by petitioner. Read as a whole, we view article IV as a declaration designed to ensure that the gifts would be deemed irrevocable, complete gifts and certifying that no reversion or other right leading to direct, personal access to corpus or income was retained by the settlor. We find no persuasive evidence, either in article IV or elsewhere in the trust instrument, that leads us to believe that decedent intended to exclude himself from the class of possible successor trustees. Nor is there any other persuasive evidence in this record that indicates that decedent intended anything other than *52 the broad, all-inclusive power to appoint successor trustees appearing in the language of article V. We find that a New Jersey court would declare that decedent had the power to appoint himself a successor trustee under the trust instrument. Therefore, such powers as were held by the trustee at decedent's death must be imputed to decedent. Petitioner further argues that, even if decedent had the power to appoint himself trustee, the powers held by the trustee at decedent's death were not those described in sections 2036(a)(2) and 2038(a)(1). Among the powers described in sections 2036(a)(2) and 2038(a)(1) are the power to distribute trust income or accumulate it and add it to corpus and the discretionary power to distribute corpus. However, when these powers are exercisable only pursuant to an ascertainable standard there is no inclusion under these sections. See Estate of Cutter v. Commissioner,62 T.C. 351 (1974); Estate of Pardee v. Commissioner,49 T.C. 140 (1967).It is certainly true (and respondent does not contend to the contrary) that the dispositive powers granted the trustee in article III, providing for the distribution of current *53 or accumulated income "for the purpose of providing for the support, maintenance or education of the beneficiary," are clear and precise in their limitation to an ascertainable standard. However, respondent argues that article VIII provides the trustee with dispositive powers described in sections 2036(a)(2) and 2038(a)(1) not subject to any such ascertainable standard. [4]
Article VIII appears toward the end of the trust instrument among other, distinctively administrative provisions. It provides for establishment of bank accounts by the trustee and for withdrawal of funds, both income and principal, from those accounts under certain circumstances and for a certain purpose. Respondent asserts that the article clearly authorizes distribution of funds to or for the benefit of the beneficiaries. However, when read to its completion, this provision is much more restrictive. *54 There is no express authorization of distribution of funds to beneficiaries, merely authorization of withdrawal by the trustee. And, while withdrawal is authorized "for the benefit of the beneficiaries," the purpose for which withdrawals may be made appears to be restricted to investment by the trustee. We have no doubt that any investments so made would be considered to be held by the trustee as trust corpus. Article VIII authorizes the trustee "to withdraw from the said account or acounts such sums of money from income or principal, from time to time, for the benefit of the beneficiaries of this trust and for the purpose of investing the same." [Emphasis added.] The use of the conjunctive in this sentence indicates that the withdrawal is to be invested by the trustee in other assets. This interpretation is also supported by the remaining provisions of the paragraph which authorizes the banks to pay such checks without question as to the payee or disposition of the funds. The initial trustee was decedent's wife. Apparently decedent wished to insure that her dealings with the trust funds would not be questioned by the banks. On its face, article VIII is logically interpreted *55 as a mere administrative provision in keeping with its relative position within the trust instrument.This interpretation is rendered even more likely by consideration of the instrument as a whole. Decedent took great care in article III to provide for the circumstances under which income and principal would be distributed. Article III comprehensively disposed of the entire trust corpus and all income, current and accumulated. In our view, the interpretation of article VIII suggested by respondent would render that article wholly inconsistent with article III and would in effect nullify the dispositive scheme clearly evidenced by article III. Respondent makes the further argument that article VIII must grant separate and unrestricted dispositive authority because the trust instrument makes no provision for termination or distribution of corpus before an initial beneficiary reached the age of 35 and yet the trust for decedent's daughter Judith was terminated and its assets distributed when she was only 26 or 27 years old. Were termination under the terms of the instrument the only possible explanation for such action, respondent's argument would be persuasive. However, where *56 the settlor, beneficiaries and sole trustee are all members of a closely knit family, we cannot ignore the most likely possibility that the termination occurred without regard to the trust instrument and by agreement among the parties, possibly informal and without legal sanction. We find that article VIII did not grant to the trustee powers described in sections 2036(a)(2) and 2038(a)(1). The article gave the trustee certain administrative powers that could not be used to affect the interests of the beneficiaries in any way not subject to review and adjustment by state courts. We find that the only dispositive provisions of the trust were those of article III and that the exercise of these powers was carefully restricted by ascertainable standards. Therefore, no part of the three trusts in existence at decedent's death is includable in his gross estate under sections 2036(a)(2) and 2038(a)(1). Alternatively, respondent has asserted that the trust established for decedent's son Frederick must be included in decedent's gross estate pursuant to section 2036(a)(1). We have found that decedent had the right to appoint himself trustee. The trust empowered the trustee to apply *57 current or accumulated trust income "for the support, maintenance or education" of Frederick when in the trustee's judgment it was "necessary or advisable." When trust income may be applied at the settlor's direction to discharge the settlor's legal obligations, the settlor is deemed to have retained the "enjoyment of, or the right to the income from, the property" within the meaning of section 2036(a)(1). Richards v. Commissioner,375 F.2d 997 (10th Cir. 1967), affg. a Memorandum Opinion of this Court; Estate of Pardee v. Commissioner,supra at 148; Section 20.2036-1(b)(2), Estate Tax Regs. Respondent argues that, by retaining the right to name himself trustee, decedent retained the right to apply trust income to satisfy his obligation to support Frederick and that therefore the corpus of the trust is includable in decedent's gross estate. Petitioner notes that respondent's regulation, section 20.2036-1(b)(2), Estate Tax Regs., provides for inclusion in the gross estate when income "is to be applied toward the discharge of a legal obligation," and *58 argues from this language that inclusion is proper only when there is a requirement that the funds be so used. Petitioner further argues that decedent's income was sufficient to satisfy any of decedent's obligations without resort to the trust funds and that no trust funds were actually distributed. Petitioner has read section 2036(a)(1) and the regulations too restrictively, however. It is the right to receive income that leads to inclusion under section 2036(a)(1), not the exercise of the right. It follows that the likelihood of exercise is irrelevant as well.If decedent, as trustee, would have had the right to use the income to discharge his legal obligations, his power falls within section 2036(a)(1). Estate of Pardee v. Commissioner,supra at 148-49. [5]
*59 Petitioner also asserts that decedent had no legal obligation to support Frederick because Frederick was emancipated and that, therefore, the trust income could not have been applied in satisfaction of such an obligation. It appears that under the law of New Jersey emancipation of a minor terminates the legal duty of a parent to support his or her child. See, e.g., Schumm v. Schumm,122 N.J. Super. 146, 299 A.2d 423 (Ch. 1973). However, there is no fixed age at which emancipation occurs. Schumm v. Schumm,supra;Straver v. Straver,26 N.J. Misc. 218, 59 A.2d 39 (Ch. 1948). At the time of decedent's death, [6] there was a presumption against emancipation before age 21 and the burden of establishing emancipation was placed on the party asserting it. Limpert v. Limpert,119 N.J. Super. 438, 292 A.2d 38 (App. Div. 1972); Straver v. Straver,supra.In Khalaf v. Khalaf,58 N.J. 63, 275 A.2d 132 (1971), the Supreme Court of New Jersey recognized an existing obligation to support an 18-year-old son then in college. *60 Decedent's son Frederick was 18 years and 9 months old at the time of decedent's death. He was attending high school and resided in the same house with decedent.Although the house in which both father and son lived was that of decedent's daughter Beverly, there is no evidence that Frederick did not remain dependent on decedent for his support and subject to decedent's control. Frederick was not employed at the time of decedent's death. We find that decedent's son Frederick was not emancipated at the time of decedent's death and that decedent was legally obligated to support Frederick on that date. To the extent of the support obligation, decedent retained the right to apply the trust income of Federick's trust to satisfy decedent's legal obligations. Petitioner has not argued that the magnitude of decedent's support obligation was less than the annual trust income of Frederick's trust. Nor has it produced any evidence that this was the case. On the contrary, the relatively small size of the trust corpus leads us to find that the maximum income that it could produce would be less than the minimum amount necessary for Frederick's support. Therefore, we find that decedent *61 retained the right to apply all trust income in satisfaction of his obligation to support Frederick. Since decedent retained the right to all of the income, all of the property transferred and any accumulated income are includable in his gross estate under section 2036(a)(1). See United States v. O'Malley,383 U.S. 627 (1966); Estate of Pardee v. Commissioner,supra at 149; section 20.2036-1(a), Estate Tax Regs. Therefore, we hold that the full value on decedent's death of the trust for Frederick, as stipulated by the parties, is includable in decedent's gross estate. Petitioner asserts that, in the event any part of Frederick's trust is includable under section 2036(a)(1), only the amount of the accumulated income is includable, and not the corpus. Petitioner reasons that since the corpus could not be distributed by decedent, as trustee, the corpus is not includable in decedent's gross estate. Petitioner cites in support of this position Leopold v. United States,510 F.2d 617 (9th Cir. 1975). In our view, the Leopold case is distinguishable from the instant case and offers no support for petitioner's contention. In *62 any case under section 2036(a)(1), the corpus may not be subject to distribution. However, where the right to the income is retained, the property transferred (the corpus) is includable in the decedent's gross estate. See, e.g., United States v. O'Malley,supra.
Section 2031 provides that: The value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. The regulations under this section provide that the value of property includable in a decedent's estate is its "fair market value at the time of the decedent's death." Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs. Both parties in the instant case have approached *63 valuation of decedent's Stirling stock by initially determining the net asset value of the corporation. The parties submitted as a joint exhibit a balance sheet of the corporation prepared by petitioner for purposes of the valuation of Stirling. The balance sheet showed assets of a value of $151,058.71. Both parties then adjusted the asset value downward for certain liabilities. However, the parties disagree about the treatment of one item listed as a liability on the balance sheet and about whether discounts from the values ascertained and for the costs of liquidating are appropriate. The balance sheet of Stirling lists as "Other Liabilities" an item of $24,977.49. Respondent did not allow this item as a reduction in arriving at net asset value. From the financial reports and tax returns of Stirling it is apparent that this amount represents the unrecognized gain latent in the installments to be received from the mortgage receivable that Stirling acquired when it sold certain real property. [7] Although petitioner challenges this conclusion, we find it to be a fact. As realized, but unrecognized, gain, the amount is not a "liability" or other account of a sort reducing the *64 net value of the corporation.Therefore, we find that respondent correctly disregarded the asserted "liability" in computing the net asset value of Stirling. [8] We reject as unfounded petitioner's assertion that respondent stipulated that the item was a liability. Respondent may be held to have stipulated to the existence of the item, to its amount, and to its pressence on the balance sheet prepared by petitioner. But no inference can be drawn that respondent stipulated to the item's effect on net asset value of the corporation. *65 Petitioner argues in its brief that the value of Stirling's mortgage receivable was less than its face value of $55,000. However, there is no evidence in the record from which we could find this to be the case. In any event, we find that petitioner has stipulated that the value of this asset is $55,000 as shown on the balance sheet. There is no evidence in this case to show that the value of this asset as shown on the balance sheet is not its actual value. Were the values in the exhibits from which this figure is taken not stipulated, there would be no evidence in the record of the values and amounts of the assets and liabilities of Stirling, and petitioner's case would fail for complete lack of proof. In our view, the stipulation of Stirling's balance sheet into evidence establishes the values of the assets and the amounts of the liabilities shown thereon as facts, absent other evidence in this fully stipulated case to show that the value of an asset or the amount of a liability is other than the amounts shown thereon. Finally, petitioner argues that the asset value of the corporation must be reduced by the costs that would be entailed in liquidating the corporation. Petitioner *66 relies on Revenue Ruling 59-60, 1959-1 C.B. 237, for this position. This ruling states in part (p. 243): (b) The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. Operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets. The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock, capitalized at rates deemed proper by the investing public at the date of appraisal. A current appraisal by the investing public should be superior to the retrospective opinion of an individual. For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and *67 dividend paying capacity. Specifically, petitioner would reduce the asset value by the amount of income taxes that would be incurred by the corporation and by decedent on liquidation and by the professional fees that would be entailed. In our view, the record does not support these reductions. Petitioner has produced no evidence that costs of liquidation would have any effect on the price a potential purchaser of decedent's Stirling stock would pay. Any such costs are purely speculative and depend upon the future economic experience of Stirling and upon the plans and circumstances of the purchaser. Petitioner's suggestion that the tax cost of liquidation to decedent should be considered in valuing the stock reflects a misunderstanding of the standard of valuation. Such cost would not affect the price at which decedent could sell his stock. Cf. Estate of Robinson v. Commissioner, 69 T.C.     (1977). In any event, the amounts petitioner has suggested as the costs of liquidation are without any support in the record. We find that no discount from asset value is appropriate in the instant case on account of hypothetical liquidation costs. We have considered petitioner's *68 argument that reductions from asset value in addition to those allowed by respondent are appropriate in valuing decedent's Stirling stock. We find that these reductions do not accurately reflect the fair market value of the stock.Therefore, we find that the fair market value of the Stirling stock held by decedent at his death was not less than that determined by respondent, $120,420. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule. -- The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death-- (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. For purposes of paragraph (1), the retention of voting rights in retained stock shall be considered to be a retention of the enjoyment of such stock. ↩
3. SEC. 2038. REVOCABLE TRANSFERS. (a) In General. -- The value of the gross estate shall include the value of all property-- (1) Transfers after June 22, 1936. -- To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person(without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.↩
4. Respondent has not asserted that the powers retained by decedent in article V require inclusion of the trusts in decedent's gross estate. Respondent apparently concedes that this provision, in accordance with its terms, gave decedent only administrative powers not within secs. 2036 (a)(2) and 2038(a)(1)↩.
5. Petitioner argues that this proposition is incorrect in light of a footnote in Leopold v. United States,510 F.2d 617, 622 n. 3 (9th Cir. 1975).In that footnote, the Court declined to decide the applicability of sec. 2036(a)(1) because the issue, whether a decedent had retained the right to apply trust income in satisfaction of his legal obligation of support, was first raised on appeal and presented "genuine factual questions." This comment, to the extent it reflects a consideration of the substance of the issue, indicates only that the Court believed that certain undisclosed factual questions were unresolved. We assume that the Court had in mind questions of whether support obligations were owed the beneficiaries and of the extent of those obligations. In any case, such a vague reference in no way undermines the clear holding in Estate of Pardee v. Commissioner,49 T.C. 140↩ (1967).
6. In 1972, after decedent's death, the New Jersey legislature enacted N.J. Stat. Ann. §§ 9:17B-1 to -3 (1976), which extended "to persons 18 years of age or older the basic civil and contractual rights and obligations heretofore applicable only to persons 21 years of age or older." Id. § 9:17B-1. In Schumm v. Schumm,122 N.J. Super. 146, 299 A.2d 423↩ (Ch. 1973), it is suggested that after the effective date of the statute (January 1, 1973) the rules stated above would be altered only in that there will be a presumption against emancipation before age 18, instead of age 21.
7. The Statement of Financial Condition of April 10, 1971, lists the amount as "Unrealized Profit on Sale of Land." Furthermore, Stirling's Federal income tax return for its fiscal year ending June 30, 1970, reflects that land was sold in April 1968 by Stirling and that Stirling elected to report the gain on the installment method. The sales price was $85,000, and the total gain realized was stated to be $38,597.49. The return showed that $10,000 was received in that fiscal year, $4,540 of which was gain recognized using a gross profit percentage of 45.4 percent. Stirling's return for its year ending June 30, 1971, shows that no receipt was made in that year. Since Stirling's mortgage receivable had a face amount of $55,000 on April 10, 1971, Stirling had received $30,000 by that date. Therefore, 45.4 percent of $30,000, or $13,620, had been recognized as gain. Of the original $38,597.49 of gain realized on the sale, there thus remained only $24,977.49 unrecognized, the precise amount of the challenged "liability." ↩
8. Respondent did allow $5,500 as a reduction of net asset value on account of the tax liability that would be triggered on the receipt of the remaining installment obligation. We express no opinion on the necessity of this adjustment, since in any event petitioner has not proved that any amount greater than $5,500 should be allowed as a reduction in determining net asset value. But see Estate of Robinson v. Commissioner,↩ 69 T.C.     (1977). There is no evidence that Stirling's taxable income, and therefore its tax rate, in years subsequent to 1970 was higher than that assumed by respondent in calculating the amount of the adjustment.