JOAN A. NEWBURGH, AS ADMINISTRATRIX AD PROSEQUENDUM FOR THE HEIRS AT LAW OF MELVIN H. NEWBURGH, DECEASED, AND AS ADMINISTRATRIX OF THE ESTATE OF MELVIN H. NEWBURGH, DECEASED, AND INDIVIDUALLY, PLAINTIFF-APPELLANT, v. LEON ARRIGO, RICHARD ARRIGO, THE STATE OF NEW JERSEY, AND THE NEW JERSEY DEPARTMENT OF TRANSPORTATION, DEFENDANTS.

Argued September 21, 1981—Decided February 23, 1982.

*Edward F. Breslin* argued the cause for appellant (*William V. Breslin*, attorney).

*Donald L. Minassian* argued the cause for respondent Steven Newburgh (*Draesel, Sunshine and Atkins*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This case concerns a dispute about the distribution of the proceeds of a settlement of a claim for the wrongful death of Melvin H. Newburgh. The defendants, who are not involved in the dispute, are charged with causing Melvin's wrongful death in an automobile accident. The claimants are Melvin's widow, Joan, and his son by a prior marriage, Steven. Joan, like Melvin, had been married previously. In 1962 she obtained an uncontested divorce in Mexico from her first husband. Steven contends that the Mexican divorce is invalid and that Joan was not legally married to Melvin. Consequently, Steven urges that Joan should not share in the distribution. The primary issue is whether the arguable invalidity of a foreign divorce is sufficient to overcome the presumptive validity of a subsequent marriage.

The trial court declined to find that Joan's Mexican divorce was invalid. Furthermore, the court found that Steven's challenge to the divorce was barred by estoppel and laches. Finally, the trial court ruled that Steven had no right to support from Melvin after reaching age 18 and that the distribution should be 80% to Joan and 20% to Steven.

The Appellate Division reversed and remanded for a plenary hearing on the validity of the Mexican divorce and the application of estoppel and laches. In remanding, the Appellate Division expressed its disagreement with the trial court's ruling that Steven had no right to financial support after reaching age 18. Both lower court opinions are unreported.

We granted certification, 85 *N.J.* 479 (1980), and now reverse in part and affirm in part. We conclude that Steven failed to overcome the presumptive validity of Joan's Mexican divorce and of her marriage to Melvin. As the surviving widow, she is entitled to share in the distribution of the proceeds of the judgment. Nonetheless, we agree that a factual issue exists whether Steven had a right to financial support, including a contribution toward a college and law school education, after attaining age 18. We remand for reconsideration of the distributive shares in light of that conclusion.

## I

Joan's first marriage ended in 1962 in an uncontested Mexican divorce.  At the time of her second marriage, in 1970, she advised the clerk of the first marriage and its termination by a Mexican divorce.  The second marriage ended in a final judgment of divorce entered in New Jersey in an uncontested proceeding on September 25, 1973.  Once again, Joan disclosed to the court her first marriage and its dissolution in Mexico.

Joan married Melvin on November 26, 1973 in New Jersey. Melvin had been married once before and his only child, Steven, was 17 at the time of his father's marriage to Joan.  On July 8, 1975, Melvin was killed in an automobile accident.  At that time, Steven was 19 and had attained his age of majority.  Joan was named administratrix of Melvin's estate.  In accordance with the intestacy statute then in effect, Joan received one-third and Steven two-thirds of the estate.  *N.J.S.A.* 3A:4–2 (1953) (current version at *N.J.S.A.* 3A:2A–34, effective September 1, 1978). Steven consented to Joan's appointment as administratrix and to the distribution of the estate in 1977.

Joan was appointed also as administratrix ad prosequendum to pursue a wrongful death action under *N.J.S.A.* 2A:31–1.  On July 6, 1978, the insurer representing Arrigo, the owner of a vehicle involved in the accident, paid into court its policy limits, $100,000.  Because Joan and Steven were unable to agree on the division of the net proceeds, the court ordered a hearing to settle the dispute.

At the hearing, Joan testified about her marriage to Melvin, her dependence on him and his support of Steven.  On cross-examination, Steven's counsel elicited that, during her first marriage, Joan had lived in no state other than New Jersey and that her first marriage had ended in a Mexican divorce.  She testified further that she was represented by counsel and appeared personally in the Mexican proceedings.  Her first husband did not appear in those proceedings.  Steven's counsel did not ask Joan about the details of her residence in Mexico or whether her

first husband had been served with process or represented by counsel in the Mexican proceedings. Steven offered no evidence attacking the validity of the Mexican divorce.

On two occasions the trial court expressed doubt about the sufficiency of the evidence challenging the presumptive validity of the Mexican divorce and the marriage of Joan and Melvin. After the hearing, the trial court permitted Steven's counsel to submit a post-trial brief on the validity of the Mexican divorce. Thereafter the trial court concluded that the proofs were insufficient to establish the invalidity of the divorce. In reversing, the Appellate Division found inapposite the presumptive validity of the latest of two or more marriages. In reaching that conclusion, the Appellate Division misapprehended that the benefit of the presumption was restricted to claims by widows in worker's compensation death cases.

## II

Until Melvin's untimely death in an automobile accident, he and Joan considered themselves husband and wife. They participated in a ceremonial marriage and lived and traveled together. They filed joint tax returns and, as Melvin's wife, Joan played golf at his country club. Financially, socially and in the eyes of the world, they were married; the law also viewed them as husband and wife. Where marital partners have engaged in prior marriages, a strong presumption supports the validity of their prior divorces and the last marriage. *Kazin v. Kazin*, 81 *N.J.* 85, 96 (1979). Reasons for the presumption are readily apparent. The presumption reflects a belief that parties would not willingly commit bigamy or illegitimize their children. *Sparks v. Ross*, 72 *N.J. Eq.* 762, 765 (Ch.1907), aff'd, 75 *N.J. Eq.* 550 (E. & A. 1909). The presumptive validity of the latest of multiple ceremonial marriages comports with the expectation of marital partners and lends stability to human affairs. Increasing incidences of divorce and remarriage strengthen the continuing need for the presumption.

In New Jersey, the presumption has been applied in contexts as varied as human experience. *Sparks v. Ross, supra* (new trial ordered in quiet title action for evidence to be considered in light of presumption where surviving second wife produced marriage certificate and evidence of 15 years cohabitation); *Dawson v. Hatfield Wire & Cable Co.*, 59 *N.J.* 190, 193 (1971) (opinion of the Court by Mountain, J.); *id.* at 205–206 (Francis, J., concurring and dissenting) (validity of ceremonial marriage not overcome by evidence that prior Georgia marriage had not ended in divorce in New Jersey or in 111 of 159 Georgia counties); *Booker v. James Spence Iron Foundry*, 80 *N.J.Super.* 68, 73–74 (App.Div.1963) (proof of prior marriages by decedent and wife was insufficient to overcome presumption since evidence did not establish that decedent's first marriage was ever valid or that wife's first husband was still living at time of later marriage); *Balazinski v. Lebid*, 65 *N.J.Super.* 483 (App.Div.1961) (clear and convincing evidence of first marriage; survival of first spouse overcomes presumption of validity of second marriage, so conveyance to husband and second wife created tenancy in common, not tenancy by the entirety); *Simmons v. Simmons*, 35 *N.J.Super.* 575 (App.Div.1955) (reversal of dismissal of separate maintenance suit by wife against second husband for a finding of whether there was a second marriage); *Minter v. Bendix Aviation Corp.*, 26 *N.J.Super.* 268, 273 (App.Div.1953), modified on other grounds, 24 *N.J.* 128 (1957) (assertion by first wife that she knew of no divorce proceedings could not overcome presumption that second wife was the widow and thus did not warrant new trial on worker's compensation claim); *Hoffman v. Jinks*, 134 *N.J. Eq.* 91, 94 (E. & A. 1943) (wife, rather than sister, of testator takes residue of estate notwithstanding evidence that former husband was alive and absent proof of annulment or divorce proceedings); *Schuler v. Schuler*, 114 *N.J. Eq.* 220, 226 (E. & A. 1933) (where husband and wife participated in ceremonial marriage and cohabited, wife ordered to pay husband from the sale of real estate placed in the wife's name); *Schaffer v. Schaffer*, 88 *N.J. Eq.* 192, 194 (Ch.1917), aff'd *sub*

*nom. Schaffer v. Krestovnikow*, 89 *N.J. Eq.* 549 (E. & A. 1918) (husband's request for annulment denied and alimony ordered for wife in reliance on the presumptive validity of second marriage).

One attacking the validity of the most recent of multiple marriages is under a heavy burden to establish its invalidity by clear and convincing evidence. *Kazin v. Kazin, supra*, 81 *N.J.* at 96. Furthermore, the challenger must meet that burden not only with respect to the occurrence and validity of a prior marriage at the time it was entered, but also its continuing validity at the time of the challenged marriage. *Dawson v. Hatfield Wire & Cable Co., supra*, 59 *N.J.* at 193. The challenger must disprove every reasonable possibility that could vitiate the prior marriage. *Id.* at 205–206.

The related presumption in favor of the validity of prior divorces is akin to estoppel to deny the validity of a prior divorce. *Kazin v. Kazin, supra*, 81 *N.J.* at 96. Both principles recognize the reality of the increasing rate of divorce and remarriage. The law no longer insists on confining people in the grave of a dead marriage. *Id.* at 98. Modern matrimonial law has relaxed the requirement for divorce and granted greater freedom to individuals in the pursuit of marital happiness.

We hold, therefore, that irrespective of the factual context in which the issue may arise, the last of two or more marriages is presumptively valid. The presumption of validity may be overcome only by clear and convincing evidence that (1) there was a prior marriage, (2) the prior marriage was valid, and (3) the prior marriage was not terminated by death or divorce before the latest marriage. We hold further that, where one attacks the validity of a divorce obtained in a foreign state or country, the challenger must prove all asserted defects, including lack of jurisdiction in the foreign court. In all respects, the burden rests not upon the party defending the most recent marriage, but upon the challenger to demonstrate invalidity of the prior divorce.

### III

Applying that long-standing presumption to this case, we conclude that the evidence failed to overcome the presumptive validity of Joan's marriage to Melvin. Steven was obliged to prove the validity of her prior marriages and the invalidity of their termination by death or divorce. *See Booker v. James Spence Iron Foundry, supra,* 80 *N.J.Super.* at 76. He proved neither proposition. The cross-examination of Joan went no farther than to establish that she had not lived in any other state. She was not asked whether she had ever resided in any other country. She was not obliged to prove that the Mexican court had jurisdiction; Steven was obliged to prove that court did not have jurisdiction. Similarly, her testimony that her first husband did not appear personally in the Mexican proceeding cannot undermine the jurisdiction of the Mexican court. Steven offered no proof that Joan's first husband did not submit to its jurisdiction or appear through counsel in Mexico. In brief, the record is marked by an absence of clear and convincing evidence of the alleged jurisdictional defect in the Mexican proceeding.

Furthermore, both Joan and Melvin acted as if the first divorce was valid. At the time Joan applied for her second marriage license, she advised the clerk of the first marriage. When the second marriage ended in divorce, she disclosed to the court her prior marriage and its termination in a Mexican divorce. After her marriage to Melvin, they lived and acted like husband and wife. Under certain circumstances, one who enters into and accepts the benefits of a marriage may be equitably estopped from denying the validity of that marriage. For example, a husband who participates in obtaining his wife's prior foreign divorce may be estopped to deny the validity of that divorce. *Kazin v. Kazin, supra,* 81 *N.J.* at 98.

In some jurisdictions, an estoppel binding an ancestor could also bind heirs, such as Steven. *In re Anderson's Estate,* 121 *Mont.* 515, 526, 194 *P.2d* 621, 626 (1948) (children estopped from challenging stepmother's divorce in will contest because father,

who encouraged and paid for divorce, would have been estopped); *In re Davis' Estate,* 38 *Cal.App.*2d 579, 585, 101 *P.*2d 761, 764 (1940) (same holding in heirship proceeding between son and stepmother). *Contra, In re Kant's Estate,* 272 *So.*2d 153, 156–157 (Fla.1972) (minor children not estopped from challenging stepmother's Mexican divorce in intestacy proceeding even if father would have been estopped); *In re Lindgren's Estate,* 293 *N.Y.* 18, 21–24, 55 *N.E.*2d 849, 850–851 (1944) (daughter not estopped from attacking parents' divorce in intestacy dispute with stepmother although both parents would have been estopped as active parties to proceeding). *But cf. Flammia v. Maller,* 66 *N.J.Super.* 440, 456–458 (App.Div.1961) (conduct of wife in obtaining Mexican divorce not imputed to first husband to estop him from asserting invalidity of divorce in intestacy dispute with purported second husband). Finally, by consenting to Joan's appointment as the administratrix of his father's estate and to her taking one-third of the estate as provided by the intestacy statute, Steven indicated his acceptance of Joan's status as his father's widow.

The amount recovered in a wrongful death action is "for the exclusive benefit of the persons entitled to take any intestate property of the decedent, and in the proportions in which they are entitled to take the same," provided they were dependent on the decedent for support at the time of his death. *N.J.S.A.* 2A:31–4. In his concurring opinion, Justice Pashman would expand the statutory definition of heirs-at-law to include one who was a wife-in-fact, although not legally married to a decedent. Justice Pashman relies on *Dawson v. Hatfield Wire & Cable Co., supra,* in which this Court held that a woman who had participated in a ceremonial marriage and lived with an employee for 16 years was entitled to worker's compensation death benefits as his widow. Writing for the Court in *Dawson,* Justice Mountain acknowledged that the purpose of worker's compensation is to place upon employers the burden of work-related accidents. He wisely recognized that the test of husband and wife in the worker's compensation context should not be the

same "as in the area of familial law where questions of property, inheritance, legitimacy of offspring and the like rightly demand a more rigid adherence to conventional doctrine." *Id.,* 59 *N.J.* at 199. We continue to adhere to that principle and decline to find a wife-in-fact to be an "heir".

That adherence also leads to the rejection of expanding the doctrine of estoppel, as espoused by Justice Handler in his concurring opinion. In his concurrence, Justice Handler urges that a ceremonial marriage following an invalid divorce should be invulnerable after the passage of an unspecified number of years "absent any showing of knowingly wrongful conduct on the procuring party's part ..." *Post* at 547. His suggestion likewise would lead to the conclusion that a wife-in-fact could inherit like a lawful wife.

The doctrine of estoppel suffers from other flaws in this case. Initially, reliance on equitable estoppel would place on Joan the burden of proving that Steven should be estopped. *Lawes v. Lynch,* 7 *N.J.Super.* 584, 593 (Ch.Div.), aff'd, 6 *N.J.* 1 (1950). By contrast, the presumption of the validity of the latest of several ceremonial marriages properly places the burden of proof on the one seeking to upset a settled relationship by challenging the validity of the marriage.

Furthermore, we agree with the Appellate Division that the record does not support a conclusion that Steven should be estopped either because of his own conduct or by imputation from Melvin's conduct. Traditionally, equitable estoppel requires proof of "a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be relied upon by the other party and on which the other does in fact rely in such a manner as to change his position for the worse". *Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 *N.J.* 334, 339 (1979); 3 *Pomeroy, Equity Jurisprudence* § 805 (5 Ed. 1941) at 191–192. Here, the record gives no indication that Melvin helped Joan in obtaining her

Mexican divorce. *See Kazin v. Kazin, supra.* Indeed, the record does not establish that, during Melvin's marriage to Joan, Melvin or Steven even knew of the Mexican divorce. Two additional reasons preclude imputing to Steven any possible estoppel of Melvin. First, Steven was a minor during much of the marriage; second, nothing indicates that Steven could have prevented the marriage. Moreover, there is no evidence that Joan changed her position for the worse in reliance on anything Steven said or did. While it is true that Steven has not repudiated the position he took in the intestacy proceeding, we see no detriment to Joan from Steven's delay in challenging the Mexican divorce.

The expanded concept of estoppel espoused in the concurrence "rests largely on the facts of each particular case" (*post* at 552), and combines elements of fairness "with the demands of public policy." *Post* at 554. As useful as that notion may be for courts in reaching a just result, it provides little guidance to parties seeking to steer a lawful course in the conduct of their personal affairs. We believe that stability in a marital relationship is promoted better by recognition of the presumption of validity of the latest of ceremonial marriages. Because we find that this presumption has not been overcome, we conclude that Joan is Melvin's widow and is entitled to share in the wrongful death award.

## IV

A question remains, however, as to Steven's entitlement to a distributive share although he had reached the age of 18 by the time of his father's death. Steven argued that his right to support continued while he pursued a college and law school education, but the trial court found that Steven had no right to support because he had attained age 18. Resolution of this issue centers on a parent's duty to support a child until the child is emancipated. Consequently, Steven, if unemancipated, may be entitled to share in the wrongful death recovery.

In general, emancipation is the act by which a parent relinquishes the right to custody and is relieved of the duty to support a child. *Cafaro v. Cafaro,* 118 *N.J.L.* 123, 124 (E. & A. 1937); *Limpert v. Limpert,* 119 *N.J.Super.* 438, 440 (App.Div. 1972). Emancipation can occur upon the child's marriage, *Leith v. Horgan,* 24 *N.J.Super.* 516, 518 (App.Div.1953), induction into military service, *Slep v. Slep,* 43 *N.J.Super.* 538, 543 (Ch.Div. 1957), by court order based on the child's best interests, *N.J. Div. of Youth & Family Serv. v. V,* 154 *N.J.Super.* 531, 536–537 (J. & D.R.Ct.1977), or by attainment of an appropriate age. Although emancipation need not occur at any particular age, a rebuttable presumption against emancipation exists prior to attaining the age of majority, now 18. *See N.J.S.A.* 9:17B–3. Attainment of age 18 establishes prima facie, but not conclusive, proof of emancipation. *Alford v. Somerset Co. Welfare Board,* 158 *N.J. Super.* 302, 310 (App.Div.1978); *Limpert v. Limpert, supra,* 119 *N.J.Super.* at 440; *Straver v. Straver,* 26 *N.J.Misc.* 218, 222, 59 *A.2d* 39 (Ch.1948). Whether a child is emancipated at age 18, with the correlative termination of the right to parental support, depends upon the facts of each case.

Generally parents are not under a duty to support children after the age of majority. Nonetheless, in appropriate circumstances, the privilege of parenthood carries with it the duty to assure a necessary education for children. Frequently, the issue of that duty arises in the context of a divorce or separation proceeding where a child, after attaining majority, seeks contribution from a non-custodial parent for the cost of a college education. In those cases, courts have treated "necessary education" as a flexible concept that can vary in different circumstances. *Khalaf v. Khalaf,* 58 *N.J.* 63, 71–72 (1971) (directing father to pay $3,200 per year towards son's college expenses); *Limpert v. Limpert, supra,* 119 *N.J.Super.* at 442–443 (father directed to continue weekly support payments for 20-year-old son as long as son was full-time student in regular courses towards undergraduate degree); *Nebel v. Nebel,* 99 *N.J.Super.* 256, 261–263 (Ch.Div.), aff'd o. b., 103 *N.J.Super.*

216 (App.Div.1968) (on motion of wife, husband ordered to pay $1,500 per year towards son's college costs); *Jonitz v. Jonitz,* 25 *N.J.Super.* 544, 556 (App.Div.1953) ( although finding that the facts did not warrant an award solely for college expenses, court ordered continued support of son while son enrolled as student); *Cohen v. Cohen,* 6 *N.J.Super.* 26, 30 (App.Div.1949) (in dicta, court noted broad power to award support including costs of an advanced education in appropriate cases); *Sakovits v. Sakovits,* 178 *N.J.Super.* 623, 630 (Ch.Div.1981) (court declined to order father to pay school expenses of 22-year-old son because son waited four years to begin college, had accepted $3,200 from father to start a business, and father had relied on son's expressed intent not to go to college in structuring his finances); *Ross v. Ross,* 167 *N.J.Super.* 441, 444–446 (Ch.Div.1979) (father directed to continue weekly support payments for 23-year-old daughter until she completed law school); *Schumm v. Schumm,* 122 *N.J.Super.* 146, 148–150 (Ch.Div.1973) (father's motion to vacate support order when son reached 18 denied because son in college); *Hoover v. Voightman,* 103 *N.J.Super.* 535, 539–540 (Cty.Ct.1968) (father ordered to continue support payments to all children, including 18-year-old college freshman).

In the past, a college education was reserved for the elite, but the vital impulse of egalitarianism has inspired the creation of a wide variety of educational institutions that provide post-secondary education for practically everyone. State, county and community colleges, as well as some private colleges and vocational schools provide educational opportunities at reasonable costs. Some parents cannot pay, some can pay in part, and still others can pay the entire cost of higher education for their children. In general, financially capable parents should contribute to the higher education of children who are qualified students. In appropriate circumstances, parental responsibility includes the duty to assure children of a college and even of a postgraduate education such as law school.

In evaluating the claim for contribution toward the cost of higher education, courts should consider all relevant factors, including (1) whether the parent, if still living with the child, would have contributed toward the costs of the requested higher education; (2) the effect of the background, values and goals of the parent on the reasonableness of the expectation of the child for higher education; (3) the amount of the contribution sought by the child for the cost of higher education; (4) the ability of the parent to pay that cost; (5) the relationship of the requested contribution to the kind of school or course of study sought by the child; (6) the financial resources of both parents; (7) the commitment to and aptitude of the child for the requested education; (8) the financial resources of the child, including assets owned individually or held in custodianship or trust; (9) the ability of the child to earn income during the school year or on vacation; (10) the availability of financial aid in the form of college grants and loans; (11) the child's relationship to the paying parent, including mutual affection and shared goals as well as responsiveness to parental advice and guidance; and (12) the relationship of the education requested to any prior training and to the overall long-range goals of the child.

In the proceeding to determine the distribution of the settlement of the wrongful death action, the trial court stated that Steven was not entitled to share in the proceeds because he had attained his majority by the time of Melvin's death. Although that statement was incorrect, the trial court awarded Steven 20% of the funds. We do not suggest that on remand the trial court must change its ultimate determination, but we cannot discern the extent to which its erroneous statement of law may have affected the judgment of the trial court. We note that Steven was at an age when many young people are seeking freedom from parental control and responsibility. Joan, on the other hand, was approaching a time in life when many women are increasingly dependent on their husbands for financial support. We note further that, under the laws of intestacy, Steven has already received two-thirds of his father's estate.

On remand, the trial court should determine, in light of the relevant facts and circumstances, whether Steven has met his burden of proving the likelihood and amount of Melvin's contribution to his college or law school education.

We reverse the judgment of the Appellate Division insofar as it failed to recognize the validity of the marriage of Melvin and Joan Newburgh. We affirm the remand to the trial court for reconsideration of the distributive shares.

PASHMAN, J., concurring.

I fully concur in the judgment and the opinion of the Court. The latest of multiple ceremonial marriages is entitled to a strong presumption of validity that can only be overcome by clear and convincing evidence. I write separately because I believe the Court's opinion should rest on an additional ground.

By limiting its reasoning to the presumptive validity of the last of multiple marriages, the Court implies that under factual circumstances similar to those present here, the presumption could be overcome in some future case. That implication should not be allowed to stand.

The purpose of the Wrongful Death Act, *N.J.S.A.* 2A:31-1 *et seq.*, is to provide for those dependent on the deceased at the time of his or her death. *N.J.S.A.* 2A:31-4. "Being remedial in nature, the statute is to be liberally construed and applied to effectuate its beneficent object." *Turon v. J & L Construction Co.*, 8 *N.J.* 543, 558 (1952). Nonetheless, our courts have been reluctant to extend recovery beyond those individuals clearly intended to be its beneficiaries. *Id.; State v. Gosnell*, 106 *N.J.Super.* 279 (App.Div.1969).

By contrast, under the Workers' Compensation Statute, *N.J. S.A.* 34:15-7, recovery has been allowed in a variety of circumstances where some technical defect may have invalidated a seemingly legitimate marriage. For example, in *Dawson v. Hatfield Wire & Cable Co.*, 59 *N.J.* 190 (1971), plaintiff had married the deceased in a formal marriage ceremony and lived

with him for sixteen years, unaware that he had been previously married and never obtained a divorce. The Court held that she was a *de facto* spouse of the deceased and entitled to recovery under the statute. *Id.*, at 196. Similarly, in *Parkinson v. J & S Tool Co.*, 64 *N.J.* 159 (1974), plaintiff had received a legal divorce from the deceased but later resumed living with him, having been advised by a priest that the couple was still married in the eyes of the church. We held, as in *Dawson*, that where a person undergoes a formal marriage ceremony and lives with the partner, believing in good faith that they are legally married, that the *de facto* marriage relationship should entitle her to recover under the Worker's Compensation statute. *Id.*, at 167–68.

Whatever reluctance our courts may have had to construe the wrongful death statute as liberally as the worker's compensation act should have been put to rest by the legislative relaxation of the divorce laws in 1972. The amendments to the divorce act, *L.* 1971, c. 212; *N.J.S.A.* 2A:34–1 et seq., rested on the legislative concern for the realities of the marital relationship and a public policy of allowing the dissolution of destroyed marriages. *Kazin v. Kazin*, 81 *N.J.* 85, 98 (1979). Justice Handler, writing for a unanimous Court, said that "[t]he differences in public policy wrought by this revision are fundamental." *Id.* at 92. "There remains little, if any, interest in encouraging the resurrection of deceased marriages, even if [the marriage were] pronounced dead by other tribunals whose processes are not completely consistent with our own." *Id.* at 98.

I would therefore hold that recovery should be allowed under the Wrongful Death Act for a *de facto* spouse when a technical defect may have invalidated a seemingly legitimate marriage.[1]

---

[1]Contrary to the majority's inaccurate assertion at 540–541, my finding that Joan Newburgh is entitled to recover under the Wrongful Death Act as a *de facto* spouse does not mean that I would allow her to inherit property as a spouse under the intestacy statute. That is a separate legal question which is

Persons living together following a formal marriage ceremony, in the good faith belief that they are legally married, are spouses entitled to share in wrongful death awards if they meet the statutory conditions of dependency. Making the benefits of the act available to *de facto* spouses who actually have been living with and dependent on the decedent serves the remedial purposes of the Wrongful Death Act.

In this case, the evidence overwhelmingly shows that Joan Newburgh entered into a ceremonial marriage with the deceased in the good faith belief that there was no impediment to the marriage. While it is true that her first marriage ended in a Mexican divorce in 1962, she had entered into a second marriage in 1970, at which time she advised the clerk of her first marriage and its termination by a Mexican divorce. She again disclosed that divorce to the court at the time her second marriage ended in an uncontested proceeding in 1973. By the time of her third marriage in 1973 to the deceased, Joan would have had no reason to doubt that she had been legally divorced from her first husband 11 years earlier.

The only possible defect to the marriage between Joan and the deceased is the possibly voidable Mexican divorce of Joan from her first husband 20 years ago. This defect is technical rather than substantial, precisely because of the change in legislative policy elaborated in *Kazin*. Joan Newburgh entered into a marriage ceremony with the deceased, lived with him, and in good faith believed herself to be his wife. Since there is no public policy for perpetuating in law a marriage that in fact has died, the 20 year old Mexican divorce should not be an obstacle to a wrongful death award.

HANDLER, J., concurring.

The major question presented in this case is whether Joan Newburgh is entitled to receive pecuniary benefits under the

---

not before the Court at this time. The two statutes have different purposes and should be interpreted accordingly.

Wrongful Death Act, *N.J.S.A.* 2A:31–1 *et seq.*, as the surviving spouse of Melvin Newburgh, who lost his life in an automobile accident. Joan's legal status as the wife—now the surviving widow—of Melvin is challenged by Steven, who is Melvin's son of a prior marriage. Steven claims that Joan, having procured an allegedly invalid Mexican divorce almost 20 years ago from her first husband, was not legally married to his father. Thus, the core issue in the case is the validity of Joan's Mexican divorce. That issue might be more precisely described, not as the validity *vel non* of that Mexican divorce, but as the *legal effect* to be given that divorce for purposes of resolving the competing claims of each of the major party protagonists under the Wrongful Death Act.

I concur in the result reached by the Court in this case. Quite properly, it has determined on this record that no legal credence should be given to the asserted invalidity of Joan's ancient Mexican divorce. I write separately, however, to point out that the rule invoked by the majority—the presumption of validity of the last of several ceremonial marriages and the sufficiency of proofs to overcome that presumption—is neither apt nor adequate to determine the legal status of the claimants as beneficiaries under the Wrongful Death Act. The rule selected by the majority fails to focus upon the legal effect of the former divorce. While the result reached by the Court is tantamount to giving no legal effect to the Mexican divorce, that decision should be based upon the application of equitable principles because we are dealing with a matrimonial event—a putative divorce and its effect upon a subsequent marriage in the context of a wrongful death claim.

The majority has described the conventional understanding of the rule that presumptive validity attaches to the last of two or more ceremonial marriages and that the presumption can only be overcome by clear and convincing evidence that such a marriage is not valid. *Ante* at 538. It also, commendably, clarifies the coverage of this rule as embracing not only claims arising under the Workers' Compensation Act but any contro-

versy concerning the legitimacy of a marital relationship. *Ante* at 536.

The rule, however, is primarily one of convenience, designed to place the evidential burden upon the party who is challenging the status quo. One who contends that a marriage is meretricious should be required to prove that proposition. See *Kazin v. Kazin*, 81 *N.J.* 85, 96 (1979); *Dawson v. Hatfield Wire & Cable Co.*, 59 *N.J.* 190, 193 (1971). While the rule may in this sense be fair and pragmatic, it frequently has nothing to do with the merits of the underlying controversy. In this case, for example, the rule is totally unrelated to the real controversy between the parties—the validity of Joan's prior Mexican divorce from her first husband and Steven's right to impugn that divorce.

In addition to its remoteness from the merits of the controversy, the rule of presumptive validity of the last ceremonial marriage was arguably unfairly invoked at the trial and improperly applied on appeal in this case. Indeed, it was almost inadvertance that gave rise to the question of the validity of the Mexican divorce in these proceedings. It was injected in the case through the cross-examination of Joan and was not really projected as an issue to be tried. Hence, while on the record Steven did not produce clear and convincing evidence to overcome the validity of Joan's marriage to his father, it is apparent that neither side was truly prepared to contest or defend the validity of the Mexican divorce. A result reached upon an inadequately tried basis hardly inspires confidence as to either its correctness or its fairness.

The presumption approach has another distinct disadvantage which I cannot ignore. Even though the party claiming that a prior divorce was invalid bears the burden of proving that proposition by clear and convincing evidence, the fact remains that this burden can be met. Therefore, under the majority's approach, a situation may arise in which the validity of an ancient divorce is challenged successfully. Yet fairness and equity may demand that, after the passage of so many years and

the absence of any showing of knowingly wrongful conduct on the procuring party's part, such long-settled matters should now be beyond attack.

These considerations impel me to urge that the controversy in this case be resolved by the application of equitable principles which focus solely and sharply upon the actual conduct of parties in resolving the merits of the central issue. The unerring focus of equity upon party conduct, I submit, is uniquely appropriate for the resolution of matrimonial disputes and especially conducive toward reaching the fair, sound, and right disposition—that elusive ultimate end that is often so difficult to identify and demonstrate in matrimonial causes.

I am suggesting neither a radical departure nor a giant step from traditional approaches in matrimonial litigation. The majority has observed that the presumption in favor of the latest ceremonial marriage implies a presumption in favor of the validity of prior divorces, which presumption "is akin to estoppel to deny the validity of a prior divorce." *Ante* at 538. It also discusses some of the equities in this case. *Ante* at 539. Hence, the equitable doctrine of estoppel is but a logical extension of the notions implicit in the majority's analysis. Estoppel should be invoked to resolve the controversy in this case because an analysis based upon the equities would provide greater clarity and sureness as to the result reached.

In applying the equitable doctrine of estoppel, it is especially important to underscore the relevance of public policy as an element of estoppel in the context of matrimonial actions. In the past, demands of public policy have led courts to deny estoppel where it otherwise would have been applicable. Thus, to prevent spouses from "frustrating the policy of our own statute which puts the dissolution of the marriage status beyond the control of the parties," courts have refused to apply estoppel to prevent a challenge to a foreign divorce. *Tonti v. Chadwick,* 1 *N.J.* 531, 537 (1949). See *Warrender v. Warrender,* 79 *N.J.Super.* 114, 121 (App.Div.1963), aff'd o. b., 42 *N.J.* 287 (1964); *Hollingshead v. Hollingshead,* 91 *N.J. Eq.* 261 (Ch.1920).

It follows that where public policy, as recognized by our matrimonial laws, calls for the vindication of different social values, that public policy should be heeded. If public policy is sufficiently vigorous to bar the application of equitable principles of estoppel, *e.g.*, *Tonti*, public policy surely has the prepotency to command an estoppel. Thus, we have recognized that public policy demands should be given deference in determining whether estoppel can be invoked to prevent the invalidation of divorces. In *Kazin*, 81 *N.J.* at 99, we stressed that in applying the equitable doctrine of estoppel, "full weight should be given the legislative objectives governing divorce." The Court there also spoke of a flexible approach to estoppel based both on individual fairness and public policy, recognizing that the "application of * * * estoppel cannot be subject to fixed and settled rules of universal application, but rests largely on the facts of each particular case." *Id.* at 94. Scholarly commentators have also noted that estoppel has often been used to effectuate contemporary policy views about marriage and divorce. Professor Clarke wrote:

> Estoppel, or quasi-estoppel, as some cautious courts prefer it, has been shown to be approved by the great majority of courts. It rests not upon vague notions of fairness or equity or relative rectitude of the parties, and not upon the dubious distinction between private and matrimonial lawsuits, but rather upon the contemporary view that when a marriage has ended, and its end has been recognized by divorce, little is to be gained by treating it as if it were still in force. To this social purpose, and to the doctrine of estoppel itself, therefore, there can hardly be serious objection. [Clarke, "Estoppel Against Jurisdictional Attack," 70 *Yale L.J.* 45, 68 (1960)]

*Cf.* Weiss, "A Flight on the Fantasy of Estoppel in Foreign Divorce," 50 *Col.L.Rev.* 409, 428–430 (1950) (New York courts used estoppel to circumvent harsh New York divorce laws).

This Court has frequently explicated our public policy concerning matrimony and divorce in a wide variety of contexts. The source of that policy is the Divorce Act of 1972, *N.J.S.A.* 2A:34–1 *et seq.* The polestar of that policy is fairness, equity, flexibility and solicitous concern for the welfare and happiness of the individuals involved. *E.g.*, on property included in equitable distribution, see *Kikkert v. Kikkert*, 88 *N.J.* 4 (1981) (right to

receive unmatured pension benefits included); *Mey v. Mey*, 79 *N.J.* 121 (1979) (trust corpus which came under spouse's control during marriage included); *Kruger v. Kruger*, 73 *N.J.* 464 (1977) (income interest subject to equitable distribution); *N.J.S.A.* 2A:34–23; on irrelevance of fault in determining equitable distribution, see *Painter v. Painter*, 65 *N.J.* 196 (1974); *Mahne v. Mahne*, 147 *N.J.Super.* 326 (App.Div.1977), certif. den. 75 *N.J.* 22 (1977); on modifying settlement agreements, see *Peterson v. Peterson*, 85 *N.J.* 638 (1981) (alimony agreement subject to equitable evaluation beyond that performed in adjudicating normal contractual rights); *Lepis v. Lepis*, 83 *N.J.* 139 (1980) (modification of support and alimony provisions of settlement agreement available to offset inflation); on granting divorces and annulments, see *Faustin v. Lewis*, 85 *N.J.* 507 (1981) (court permitted to weigh equities in deciding whether to grant annulment to wife who married for sole purpose of becoming lawful permanent U. S. resident); *Chalmers v. Chalmers*, 65 *N.J.* 186 (1974) (dual divorce available); *N.J.S.A.* 2A:34–2(d) (no-fault ground for divorce now available after 18-month separation); on awarding alimony in an annulment action, see *Kozlowski v. Kozlowski*, 80 *N.J.* 378 (1979); *Callaghan v. Leonard*, 152 *N.J. Super.* 95 (Ch.Div.1977); *N.J.S.A.* 2A:34–23; on child custody, see *Beck v. Beck*, 86 *N.J.* 480 (1981) (courts authorized to decree joint custody). See also *Kazin*, 81 *N.J.* at 94 (courts advised to "give full range to equitable doctrines in dealing with matrimonial controversies") (husband estopped from asserting invalidity of wife's prior divorce which he helped her secure).

These contours of our public policy have not only been defined by our operative matrimonial statutes and judicial decisions but also by other official efforts and contributions to our laws and procedures in the matrimonial field. Thus, several years ago a special committee under the chairmanship of Justice Pashman was constituted by the Supreme Court to recommend judicial improvement in the field of matrimonial practice and adjudication. In authorizing the formation of this committee, Chief Justice Hughes expressed the Supreme Court's "acute concern

over * * * the plight of persons presently caught in the web of matrimonial litigation." 102 *N.J.L.J.* 545, 552 (1978). This was followed by two comprehensive reports now adopted by the Supreme Court, signalling major and far ranging improvements in the matrimonial area to further the ends of individual and social justice. See Phase Two Final Report of the Supreme Court Committee on Matrimonial Litigation, 108 *N.J.L.J.* 41 (Special Supplement) (July 16, 1981); Interim Report of the Supreme Court Committee on Matrimonial Litigation, 104 *N.J. L.J.* 107 (1979).

An important element of this public policy and substantive law concerning marital relationships of New Jersey citizens relates to the status of previous marriages and divorces. We have stated, with pointed emphasis, that the objectives of the policy

> reflect a genuine concern for the realities of the marital relationship and allow the expeditious, orderly and fair dissolution of destroyed marriages * * *. There remains little, if any, interest in encouraging the resurrection of deceased marriages, even if pronounced dead by other tribunals whose processes are not completely consistent with our own. [*Kazin*, 81 *N.J.* at 99]

As recognized by the majority, *Kazin* encourages an expanded approach to estoppel, combining elements of fairness in the traditional sense with the demands of public policy. In this case considerations of public policy constitute an important and weighty factor that militates against the allowance of Steven's claim that the marriage between Joan and his deceased father is meretricious. The only basis for this assertion is the alleged invalidity of the Mexican divorce which Joan obtained in 1962 from her first husband. That event occurred almost twenty years ago. No one, other than Steven, has even questioned the authenticity of this divorce. Further, Joan married a second time and remained married for several years before obtaining a divorce from her second husband. Again, there is no suggestion that this second marriage should be impugned or stigmatized as bigamous. Surely, considering that two decades have passed since the Mexican divorce and that the State has given its imprimatur to Joan's subsequent marriages and divorces, there

is no reason to believe that she and Melvin did not consider themselves legally married. Furthermore, there is no indication that Joan at any time in her marital history purposefully sought to evade the matrimonial laws of this State or that she egregiously flouted social conventions and policy. Moreover, as previously noted, the forced recognition of dead and mummified marriages is clearly contrary to public policy.

In addition to considerations of public policy, elements of fairness call for an estoppel against Steven. As noted by the majority, Steven consented to Joan's appointment as the administratrix of his father's estate and to her taking the widow's one-third share of the estate under the intestacy statute. *Ante* at 540. While Steven may not have known of Joan's old Mexican divorce, it seems apparent that such information could have been obtained had it been sought. Moreover, in these proceedings Steven has never repudiated his prior stance regarding the legality of his father's marriage to Joan and her status as his widow under the intestacy laws. Steven should not be allowed to gain a tactical and telling advantage over his stepmother Joan in these proceedings by assuming inconsistent legal positions. Estoppel would prevent that from happening.[1]

---

[1] Also implicated in this case is the doctrine of laches, an equitable defense often associated with estoppel. See *Kazin v. Kazin*, 81 *N.J.* 85, 94 (1979); *Untermann v. Untermann*, 43 *N.J.Super.* 106, 109 (App.Div.), certif. den., 23 *N.J.* 363 (1957). See generally *Dobbs, The Law of Remedies*, § 2.4 at 45 *et seq.* (1975). The laches doctrine comes into play where there is an unexplained and inexcusable delay in enforcing a known right. See generally *Flammia v. Maller*, 66 *N.J.Super.* 440 (App.Div.1961). In this case it cannot be said that Steven engaged in inexcusable delaying tactics because his rights to these wrongful death benefits did not accrue until after his father's death. Nevertheless, he attacks the validity of a divorce decree issued almost twenty years ago, raising questions about the staleness of that claim. Moreover, he did not raise this issue at the earliest possible opportunity, having failed to question the prior divorce when his father's estate was settled intestate. Laches involves more than mere delay or lapse of time. See *Hyland v. Simmone*, 152 *N.J.Super.* 569 (Ch.Div.1977), aff'd, 163 *N.J.Super.* 137 (App. Div.1978); *Finley v. U. S.*, 130 *F.Supp.* 788 (D.C.N.J.1955). A laches question involves a weighing of equitable considerations. See *Weber v. Pieretti*, 72

The majority has also implicitly recognized that in these circumstances, Melvin would have been equitably estopped from denying the validity of Joan's divorce from her first husband and of his marriage to her. *Ante* at 539. I agree with this observation, as well as the justness of derivatively giving that estoppel binding effect upon his heir, Steven. *Id.*

Courts have recognized that in appropriate circumstances an estoppel binding an ancestor could also bind his heirs. See, *e.g., In re Davis' Estate*, 38 *Cal.App.*2d 579, 585, 101 *P.*2d 761, 764 (1940) (son estopped from challenging stepmother's Nevada divorce in heirship proceeding because father, who encouraged and paid for divorce, would have been estopped); *In re Anderson's Estate*, 121 *Mont.* 515, 526, 194 *P.*2d 621, 626 (1948) (estoppel applied in will contest between children and stepmother). This is such a circumstance. This case concerns wrongful death benefits. Such benefits are intended to compensate those whom the deceased had a legal obligation to support and who were actually dependent upon him. Since those individuals have now lost their means of support through the wrongful death of the deceased, they are entitled to a recovery to compensate them for their pecuniary loss. See *Alfone v. Sarno*, 87 *N.J.* 99 (1981). Melvin was legally obligated to support Joan and she was dependent upon him. He would not have been able to invoke the invalidity of the prior Mexican divorce to avoid that support obligation. Viewed in this light, it would be an ironic result if

---

*N.J.Super.* 184 (Ch.Div.1962), aff'd, 77 *N.J.Super.* 423 (App.Div.1962); *Pierce v. International Tel. & Tel. Corp.*, 147 *F.Supp.* 934 (D.C.N.J.1957). Therefore, while laches does not dispose of this case, many of the equitable considerations which go into the establishment of a laches defense are present in this instance. *Cf. O'Keeffe v. Snyder*, 83 *N.J.* 478, 507 (1980) (Handler, J., dissenting) (court should weigh equities in determining whether certain paintings stolen thirty years earlier should be returned to their original owner); *Bridgeton Ed. Assoc. v. Bd. of Ed. Bridgeton*, 132 *N.J.Super.* 554 (Ch.Div. 1975) (although laches not strictly applicable, plaintiffs' remedies limited because of their failure to file complaint with "reasonable promptness").

the decedent's son were to be allowed to use that prior divorce to deny Joan a recovery designed to replace the support she was entitled to receive from her husband before his death. Steven should not now be able to assert rights which Melvin no longer could claim at the time of his demise.

In sum, the strong public policy generated by the facts of this case impel a finding that Steven be estopped from asserting his claim. This is not a case where there is any allegation of fraud by the spouse upon the court. Nor is there advanced any assertion of deceit or unfairness by Joan upon any of her spouses. In this case, although Joan may have acted improperly, her legal transgressions cannot now be viewed as so great as to be inexcusable or beyond the therapeutic reach of the estoppel doctrine. Moreover, the result of finding an estoppel in this case cannot be said to be manifestly unfair to Steven since he has taken inconsistent positions regarding the validity of the marriage. The practical result of an estoppel is merely to prevent Steven from denying legal recognition of Joan's status as an actual dependent entitled to pecuniary benefits under the Wrongful Death Act.

For these reasons, I separately concur with the result reached by the Court in this case.

PASHMAN and HANDLER, JJ., concurring in the result.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*Opposed*—None.