796 A.2d 951 (2002)
351 N.J. Super. 54
Gaynell GAC (a/k/a Gaynell Ciccarelli), Plaintiff-Respondent,
v.
Paul Ludwig GAC, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 8, 2002.
Decided May 21, 2002.
*952 Antholis & Courtney, attorneys for appellant (William J. Courtney, Flemington, of counsel and on the brief).
Sonageri & Fallon, attorneys for respondent (Gerard C. Fallon, Hackensack, on the brief).
Before Judges BAIME, AXELRAD and BILDER.
The opinion of the court was delivered by BAIME, P.J.A.D.
Defendant appeals from a post-divorce judgment order requiring him retroactively to pay fifty percent of his daughter's tuition loans which she incurred while obtaining an undergraduate degree at Quinnipiac College. He argues that the Family Part judge failed to consider and weigh the factors described in Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982). We reverse the order entered and remand for further proceedings.

I.
The parties were married in 1971. Two children were born of the marriage, Justin and Alyssa. Justin was eight and Alyssa was five when the parties separated in 1983. The parties were divorced in 1987. While the judgment required defendant to pay $225 per month in child support, it was silent concerning the obligations of the parties toward the college expenses of the children.
It is undisputed that the marriage was a stormy one. During the divorce proceedings, the Family Part ordered Dr. Mathias Hagovsky to perform a psychological evaluation of the family. Plaintiff recounted in her interview with Hagovsky that the marriage was punctuated by defendant's abusive and threatening acts. She asserted that defendant "physically abused her in [the presence] of the children." This allegation was corroborated by Justin who told Hagovsky that he "had seen violence and bitter exchanges between his parents." Hagovsky found that Justin was "traumatized" by these experiences, "convinced that his father would not change," and felt "no safety in contact with [defendant]," fearing that defendant "could hurt someone." Alyssa harbored similar feelings toward defendant. While convinced that her mother "want[ed] her to [visit] with [defendant]," she felt "nervous" about that prospect and "despite her best intentions," was unable "to tell her father how she really felt." Defendant admitted to Hagovsky that he "ha[d] a terrible temper in the past which affect[ed] his wife and children." While "frustrated" by his children's negative feelings toward him, defendant conceded that "there was a good deal of rage and face-to-face screaming to which the children were often exposed."
These experiences had a profound effect on the parties and both children. Dr. Hagovsky observed:
Essentially, both children and their mother have allied themselves in a very effective manner against the father to the point where considerable fear and trauma exists even at the possibility of *953 contact between them. At the moment, this fear is real to the children and to Mrs. Gac as well, and is unlikely to be effectively assuaged even with direct, psychotherapeutic intervention.
In effect, these three have divested themselves emotionally from their husband and father to the point where productive contact is literally impossible. As a result, it is the examiner's impression that to force the issue of contact would be counter-productive and perhaps even destructive to the well being of these children. In their view, seeing their father is an unpleasant, even traumatic resurrection of bad experiences and is to be avoided at all costs. Therefore, the examiner recommends to the court and to Mr. Gac that he refrain from demanding visitation time with the children. It would be in their best interests to publicly make such a statement on the record emphasizing that to do so would be accomplished only by virtue of what is in their best interests and not by dint of his own lack of interest in seeing them.
Formal statements of availability at any time should they wish access should be made including an opportunity for him to write or perhaps even call on special occasions; a chance to send occasional gifts to the children should also be made available. Emphasis should be placed on Mr. Gac's development of this "one way" relationship until such times as the children develop their own need to respond to him.
The Family Part followed Hagovsky's recommendation and did not order visitation between defendant and the children. Although defendant sought to develop a relationship with the children, these efforts proved wholly unavailing. Defendant followed the advice of Dr. Hagovsky and pursued the "one way" relationship recommended, but neither Justin nor Alyssa ever responded. To the contrary, at age sixteen Alyssa made it clear that she did not consider defendant to be her father and she did not want to see him. She reiterated that sentiment at age twenty-two. Even when she attended the funeral of defendant's mother, Alyssa did not utter a word to him. She also stated that she did not "feel comfortable" receiving letters from defendant.
During the period between 1987 and 1994 defendant sent postcards, packages, holiday cards, and monthly or bi-weekly letters to the children. He did not telephone the children, because he was told that they did not want to speak with him. With the exception of returning the written cards and letters to defendant with a note, which read: "we don't want to hear from you. We don't want anything to do with you," Alyssa did not respond to her father's communications. These communications stopped in 1994 when Alyssa moved with her maternal grandparents and plaintiff to Vermont. Plaintiff did not provide defendant with her telephone number or address when she moved with the children.
In 1994, when Justin was nineteen and Alyssa was sixteen, defendant moved to reduce temporarily his child support payments, because he was unemployed and his unemployment benefits were about to expire. He also sought to establish family mediation, and to require plaintiff to send monthly reports and photographs of the children. At that time, Alyssa sent a letter to the court stating:
I was told about the situation concerning [defendant]. I would like to say a few things to you to impress my feelings about having you set up visitation with my father. I do not feel, under any circumstances that I should be forced to visit [him]. I use the word "forced" *954 because visiting [defendant] would be against my wishes. He has never been a father to me, and for him to say he wants to start now is not only pitiful, but insulting. The only father figure in my life is my grandfather he gives me more love and support, and is more of a father to me than [defendant]. I hope you understand what I am saying and how I feel.
On August 5, 1994, the Family Part judge denied, without prejudice, defendant's motion for family mediation. The judge granted defendant's request for monthly reports, which were to begin on September 1, 1994. Additionally, the judge reserved decision on defendant's motion to reduce child support until documents were received and the court could conduct a Lepis[1] hearing. The court did not conduct that hearing because defendant subsequently obtained employment.
Defendant continued to make the $225 monthly child support payments until May 2000. On July 11, 2000, after Alyssa graduated college, defendant filed a motion to terminate his child support obligations for both children. At that time, Justin was twenty-five years old and Alyssa was twenty-two years old. Plaintiff opposed that motion and cross-moved for reimbursement of Alyssa's college tuition.[2] The record does not reveal whether the court heard arguments on that motion.
On August 25, 2000, the Family Part entered an order terminating defendant's child support obligations as of July 11, 2000. The judge also ordered that defendant pay fifty percent of the loans Alyssa incurred pursuing her undergraduate degree. The order required plaintiff to provide proof of Alyssa's loans, excluding those from family members. The record does not reveal whether a statement of reasons accompanied that order. Nor does the order state whether the judge placed his reasons on the record.
Thereafter, plaintiff submitted a statement to the Family Part indicating the principal amount of Alyssa's non-family member student loans as $62,818 with interest of $7912. On October 2, 2000, the judge entered an order requiring defendant to pay $35,000 of Alyssa's student loans. The judge also ordered the matter stayed while the parties pursued further discovery. The preprinted language of the order states that the court conducted a hearing, but the record does not indicate whether the parties actually appeared. Also, neither the record nor the order reveals whether a statement of reasons accompanied the October 5, 2000 order. To the contrary, the record discloses that hearings were conducted on December 21, 2000 and May 2, 2001, after the court entered the order requiring defendant to reimburse his estranged daughter for her college tuition.
Much of the hearings that were ultimately conducted were devoted to defendant's claim that he has been totally rejected by both Justin and Alyssa. That fact is not in dispute. Alyssa explained that she wanted nothing to do with defendant. She testified that her "earliest memories [were] of [her] father and mother fighting." She recalled a great deal of "violence." Alyssa recounted that Justin was "very protective of [her] and [would] take [her] to places in the house where [she] could not see or hear the fighting." Alyssa vividly remembered her "father pulling [her] mother's hair and screaming [at her]." She "observed" several incidents *955 in which her mother was "screaming in pain."
At the hearing, defendant testified as to his social and financial status. Defendant remarried in 1989. A daughter was born, who was six years old at the time of the hearings. Defendant also has two stepchildren. Between 1987 and the early 1990's defendant held various jobs where he earned six dollars per hour. In the early 1990's he enrolled in paramedic training school. Defendant stated that he paid part of the $6800 tuition with a $3000 loan from his father-in-law, and made $2800 in installment payments. Additionally, his stepdaughter, who was paying her own way through college at that time, loaned him $1000 of her scholarship money to pay the balance of the tuition. Then, in 1995 defendant began working as a firefighter in Philadelphia. At that time he earned approximately $23,000 a year. Defendant estimated his annual salary for the past four years as follows: 1997$32,000; 1998$38,000; 1999$42,000; and 2000 $50,000.
Defendant was required to reside in Philadelphia as a condition of his employment. Initially he rented a room, but later purchased a 700 square foot "row house" for $27,000. The monthly mortgage payment on that house is $290.83. The outstanding balance of that mortgage is approximately $25,000. Defendant primarily resides with his current wife in a house in Barnegat. His current wife purchased the house in 1991 for $150,000. A mortgage in the principal amount of $120,000, with monthly payments of $1400, remains on that house.
Plaintiff testified as to her financial status. After the parties separated, she and the children resided with plaintiff's parents in New Jersey. Plaintiff returned to college and began teaching school in New Jersey. Sometime in 1992 plaintiff filed for food stamps. In 1995, she filed a bankruptcy petition. Also in 1995, plaintiff suffered an injury that prevented her from working. She received $200 in weekly disability benefits. Plaintiff currently earns $200 a week as a part-time teacher in Vermont where she continues to reside with her parents.
On June 4, 2002, the Family Part judge issued a letter opinion in which he reinstated his prior order requiring defendant to pay $35,000 of Alyssa's student loans. Although the judge referred to Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031, he focused his attention on only two of the twelve factors described in that opinion. The judge characterized as "irrelevant" the fact that Alyssa had totally rejected defendant's efforts to establish a "mutually affectionate" relationship, noting that it was "futile" to "try [and] fix blame." The judge found that defendant's position as a firefighter provided a sufficient financial basis to require him to contribute one-half of Alyssa's loans plus interest if he is to make that payment in installments.
It is against that backdrop that we review the Family Part's order.

II.
We begin our analysis by reciting well-settled principles. By virtue of statute, N.J.S.A. 9:2-4, and case law, Grotsky v. Grotsky, 58 N.J. 354, 356, 277 A.2d 535 (1971), parents are equally charged with their children's care, nurture, education and welfare. In general, this obligation terminates upon the emancipation of the child. Emancipation can occur upon the child's marriage, by court order, or by attainment of an appropriate age. Newburgh v. Arrigo, 88 N.J. at 543, 443 A.2d 1031. A rebuttable presumption against emancipation exists prior to attaining the age of majority. See N.J.S.A. 9:17B-3.
*956 Parents are thus not ordinarily under a duty to support children after the age of majority.
However, "in appropriate circumstances, the privilege of parenthood carries with it the duty to assure a necessary education for [the] children." Newburgh v. Arrigo, 88 N.J. at 543, 443 A.2d 1031. The concept of what constitutes a "necessary education" has changed considerably in recent years. In Khalaf v. Khalaf, 58 N.J. 63, 275 A.2d 132 (1971), our Supreme Court observed that "[w]hile a `common public school and high school education' may have been sufficient in an earlier time,... the trend has been toward greater education." Id. at 71, 275 A.2d 132 (quoting Ziesel v. Ziesel, 93 N.J. Eq. 153, 115 A. 435 (E. & A.1921); see also Limpert v. Limpert, 119 N.J.Super. 438, 441, 292 A.2d 38 (App.Div.1972); Sakovits v. Sakovits, 178 N.J.Super. 623, 628, 429 A.2d 1091 (1981)).
This subject was covered at length by the Court in Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031. There, as in its earlier opinion in Khalaf, the Court observed that "[i]n the past, a college education was reserved for the elite, but the vital impulse of egalitarianism has inspired the creation of a wide variety of educational institutions that provide post-secondary education for practically everyone." Newburgh v. Arrigo, 88 N.J. at 544, 443 A.2d 1031. While the cost of a college education has vastly increased over the years, "[s]tate, county and community colleges, as well as some private colleges and vocational schools provide educational opportunities at reasonable costs." Ibid. Emphasizing the emerging need for post-secondary education, the Court stated that "[i]n general, financially capable parents should contribute to the higher education of children who are qualified students" and "[i]n appropriate circumstances, parental responsibility includes the duty to assure children of a college and even of a post-graduate education such as law school." Ibid. Justice Pollock, writing for the Court, enunciated specific standards and guidelines to be applied:
In evaluating the claim for contribution toward the cost of higher education, courts should consider all relevant factors, including (1) whether the parent, if still living with the child, would have contributed toward the costs of the requested higher education; (2) the effect of the background values and goals of the parent on the reasonableness of the expectation of the child for higher education; (3) the amount of the contribution sought by the child for the cost of higher education; (4) the ability of the parent to pay that cost; (5) the relationship of the requested contribution to the kind of school or course of study sought by the child; (6) the financial resources of both parents; (7) the commitment to and aptitude of the child for the requested education; (8) the financial resources of the child, including assets owned individually or held in custodianship or trust; (9) the ability of the child to earn income during the school year or on vacation; (10) the availability of financial aid in the form of college grants and loans; (11) the child's relationship to the paying parent, including mutual affection and shared goals as well as responsiveness to parental advice and guidance; and (12) the relationship of the education requested to any prior training and to the overall long-range goals of the child.

[Id. at 545, 443 A.2d 1031].
As we noted earlier, the Family Part judge in this case referred to only two of the factors set forth in Newburgh. One factorthe relationship between defendant and Alyssa and her responsiveness *957 to parental advice and guidancethe judge found to be irrelevant. The second factorthe financial resources of the partiesthe judge in highly conclusory language determined that defendant had the ability to shoulder one-half of Alyssa's student loans. The judge ignored all of the other factors described by the Court in Newburgh that come to bear in determining whether a parent should be required to contribute to a child's college expenses. Among other circumstances, the judge should have considered the fact that: (1) defendant was excluded from participating in decisions pertaining to Alyssa's college education, (2) plaintiff and Alyssa chose a relatively expensive private college rather than available New Jersey or Vermont institutions, (3) Alyssa apparently did not seek summer employment during several of the years she attended college, (4) there may have been additional grants available that would have defrayed a portion of Alyssa's college expenses, and (5) plaintiff did not seek reimbursement of Alyssa's student loans during the years these obligations were incurred, thus possibly impairing defendant's ability to make sound financial judgments.
The judge's failure to consider the full set of applicable standards and guidelines and to render specific findings regarding these criteria undermines our confidence in the ultimate conclusion he reached. The obligation to find facts and state conclusions of law is explicit in R. 1:7-4. "The necessity to remind trial judges of their [duty] to make findings of fact and conclusions of law arises far too frequently." Matter of Will of Marinus, 201 N.J.Super. 329, 338, 493 A.2d 44 (App. Div.), certif. denied, 101 N.J. 332, 501 A.2d 981 (1985). Our case law is abundant with such reminders. See, e.g., Curtis v. Finneran, 83 N.J. 563, 569-70, 417 A.2d 15 (1980); Brewster v. Keystone Ins. Co., 238 N.J.Super. 580, 587, 570 A.2d 468 (App. Div.1990); Tronolone v. Palmer, 224 N.J.Super. 92, 104, 539 A.2d 1224 (App. Div.1988); Girandola v. Borough of Allentown, 208 N.J.Super. 437, 440-41, 506 A.2d 64 (App.Div.1986); State v. Singletary, 165 N.J.Super. 421, 424-25, 398 A.2d 576 (App. Div.), certif. denied, 81 N.J. 50, 404 A.2d 1150 (1979); Pressler, Current N.J. Rules, Comment R. 1:7-4 (2001). The Family Part's failure to satisfy this obligation requires us to reverse the order entered and remand for further proceedings.
We emphasize, however, that we do not reject as out of hand the judge's conclusion that defendant should retroactively bear the obligation to pay a portion of Alyssa's student loans. See Weitzman v. Weitzman, 228 N.J.Super. 346, 357, 549 A.2d 888 (App.Div.1988), certif. denied, 114 N.J. 505, 555 A.2d 623 (1989). While the judge should consider the fact that Alyssa has rebuffed defendant's attempt to establish a relationship, that undisputed fact, standing alone, does not necessarily eradicate the parental obligation to make appropriate contributions for college education. In Moss v. Nedas, 289 N.J.Super. 352, 674 A.2d 174 (App.Div.1996), we considered the question whether a non-custodial father is obligated to reimburse his estranged daughter for any part of the student loans she incurred where she neither advised her father of her decision to attend college nor sought his advice and guidance on the subject. There, the trial judge terminated the father's obligation to contribute to the college expenses of his daughter. Id. at 353, 674 A.2d 174. Considering "the absence of any meaningful" father-daughter relationship, the judge found it inappropriate to compel the father to contribute to his daughter's college expenses." Id. at 360, 674 A.2d 174. We sustained that conclusion, finding that the *958 judge had properly applied the Newburgh factors. Id. at 353, 674 A.2d 174.
We do not read Moss as holding that a child's rejection of a parent's attempt to establish a mutually affectionate relationship invariably eradicates the parent's obligation to contribute to the child's college education. In this case, for example, a judge could reasonably find from the evidence that defendant's abusive conduct during the marriage so traumatized the children as to render nugatory any real possibility of a rapprochement. In that event, it would not be reasonable to penalize Alyssa for the defendant's misconduct. Nor would it be reasonable to reward defendant by removing his financial obligation to contribute to his daughter's college costs. There are indeed circumstances where a child's conduct may make the enforcement of the right to contribution inequitable, but here it is claimed that it was the defendant himself who was the architect of his own misfortune.
Unfortunately, the Family Part judge made no finding, one way or the other, respecting this issue. To the contrary, the judge specifically disavowed any attempt to determine the truth or falsity of the allegations concerning violence and abuse or the psychological sequelae that allegedly followed.
We are thus constrained to reverse the order entered and remand the matter for further consideration. The parties should be afforded the opportunity to supplement the record with additional relevant testimony and material. The Family Part judge is to apply the Newburgh criteria and to make explicit findings of fact and conclusions of law. We do not retain jurisdiction.
NOTES
[1] Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980).
[2] Although plaintiff did not file a formal cross-motion, this relief was requested in her opposition to defendant's motion.